## *JOHN RENFRO v. THE STATE.

### No. 1910. Decided March 13, 1900.

**1. Special Venire—Amendment of Return of.**

It is competent for the court, after a motion to quash the special venire, to permit the sheriff to amend his return upon the same by adding "not found after diligent search."

**2. Change of Venue—Controverting Affidavits.**

Where the controverting affidavits, filed by the State in opposition to defendant's motion to change the venue, stated that defendant's compurgators "lived in an extreme portion of the county; that they are not acquainted with the public sentiment of said county and have no means, or, if any, very limited means of acquiring such knowledge, and that affiants do not believe that the said compurgators are qualified to speak of the subject matter contained in the affidavit for change of venue," this was a sufficient attack upon the credibility and means of knowledge of said compurgators.

**3. Change of Venue—Evidence Insufficient to Support the Motion for.**

See opinion for evidence held insufficient to support defendant's motion for change of venue based upon the two statutory grounds of prejudice and combination of influential persons against him.

**4. Same—Cross-Examination of Witness.**

It is competent, on the cross-examination of a witness with reference to a change of venue, to ask him, "Is not the prejudice existing against the case and not against defendant as an individual?" "Prejudice," as mentioned in article 615, Code of Criminal Procedure, is such prejudice against the accused himself or a prejudgment of his particular case or crime. It may be either or it may be both.

**5. Murder—Evidence—Motive.**

On a trial for murder it is always proper to show motive on the part of defendant to commit the homicide, and the fact that, in doing so, a separate and independent crime may be established or proven does not render the proof of such motive inadmissible.

**6. Same—Threats.**

On a trial for murder, evidence is admissible which tends to explain threats made by defendant.

**7. Continuance—Second Application.**

It is proper to overrule a second application for continuance which does not comply with the statute as to diligence, and where the absent testimony is not material or probably true.

**8. Challenge to Juror—Bill of Exceptions.**

A bill of exceptions complaining that the court compelled defendant to exhaust one of his peremptory challenges upon a juror claimed to be incompetent on account of his formed opinion as to defendant's guilt, will not be considered where the bill fails to show that defendant had exhausted all his peremptory challenges.

**9. Witness—Re-examination.**

On cross-examination of a State's witness, defendant's counsel asked him about his own connection with regard to certain slanderous statements about the daughters of deceased; and, amongst other matters, about a conversation between witness and defendant in relation to the same. The State objected, and claimed the right, if defendant persisted in such cross-examination, to re-examine the witness fully as to such matters; whereupon defendant's counsel stated his

---

*This case should have appeared in the 41st volume of the Texas Criminal Reports, but it only reached the hands of the Reporter on October 26, 1901. after the 41st volume was complete.

willingness that the State might do so. Held, on re-examination by the State it was competent to ask the witness to state all that was said in the conversation between himself and defendant.

**10.  Hearsay and Self-Serving Testimony.**

Evidence which is purely hearsay and partly self-serving is inadmissible.

**11.  Evidence—Reputation for Truth and Veracity.**

On a trial for murder, where the defendant had testified as a witness in his own behalf, it was germane and proper to permit witnesses to be introduced to prove what his (defendant's) reputation for truth and veracity was at the time of his testifying as a witness. The fact that his then reputation might have been caused from some previous act of his would not make the testimony inadmissible.

**12.  Impeachment of Witness—Evidence Supporting Him.**

On a trial for murder, where a witness testified differently from his written testimony taken at the inquest, whereupon he was shown his written testimony and asked if it was not true, to which he replied, "If it was in there, it was true," Held, this was simply refreshing the witness' memory and was not such an impeachment as authorized the introduction of evidence to bolster up his reputation for truth and veracity.

**13.  Improper Argument—Practice.**

In order to avail of objections to improper statements in argument of counsel, it is essential not only that the same should have been objected to, but a special instruction must also be requested to the effect that the jury should disregard such statements.

**14.  Murder—Evidence—Motive.**

On a trial for murder, growing out of a pending prosecution against defendant for slandering the daughters of deceased, it was competent, as tending to show the motive of defendant in committing the homicide, to introduce the complaint and information for slander, and, in connection therewith, the subpoena for deceased as a witness in said case.

**15.  Same—Privileged Communication.**

On a trial for murder growing out of a prosecution against defendant for slandering the daughters of deceased it was competent for the State to prove that defendant had written certain statements in blank books taken from the person of defendant at the time of his arrest, which he claimed were written by him as information for his lawyers in the prosecution for slander. Such statements were not privileged communications to his lawyers and as such exempt as evidence.

**16.  Murder—Self-Defense—Apparent Danger—Charge.**

On a trial for murder, where there was no testimony presenting any other character of danger than an immediate intention on the part of deceased to do defendant bodily harm, and the court had fully charged the law of self-defense as applicable to the facts, it was not error to refuse a special instruction on apparent danger—that issue not being raised by the evidence.

APPEAL from the District Court of Johnson. Tried below before Hon. J. M. HALL.

Appeal from a conviction of murder in the first degree; penalty, death.

Appellant was charged by the indictment with the murder of M. M. Williams on the 3d day of February, 1899, by shooting him with a pistol.

The facts leading up to, and attendant upon, the killing may be briefly summed up as follows: Defendant, Renfro, had been paying his attentions to Miss Nora Williams, a daughter of deceased, for about one and a half years prior to the filing of a complaint against him by one

Andy Woodson, about the month of May or June 1898, charging him with slandering Nora Williams by stating that he, defendant, had repeatedly had carnal intercourse with the said Nora. Information based upon the complaint was also filed in the county court. It was proven that defendant made frequent threats of serious injury against deceased after this prosecution for slander was instituted. Deceased had been subpoenaed as a witness in the case. The slander case was continued until it was finally set for trial at 10 o'clock on February 3, 1899. On that morning defendant purchased a pistol and cartridges, loaded the same, and, about 9:30 o'clock, after having seen his lawyers, started for the courthouse. He reached the courthouse door and, turning round, saw deceased, M. M. Williams, approaching the courthouse behind him, and distant from him some fifteen or twenty feet. He says that as he turned round Williams threw a rock at him which just grazed his head. There is some testimony tending to support this statement, but there was other testimony to the effect that Williams did not throw or attempt to throw a rock until after defendant had fired upon him. All the testimony shows that defendant immediately emptied his pistol as fast as he could fire it, striking Williams several times with his balls and inflicting fatal wounds, causing his death in a very few moments. Defendant surrendered to an officer in the courthouse and asked to be locked up in jail. After he was taken in custody by the officers two tablets or blank books were taken from his person in which he had written certain statements concerning the slander case. These are the books the State used at the murder trial and to the use of which defendant objected upon the ground that the statements had been written by him for the information of his attorneys in the slander case, and as such were privileged communications.

Defendant introduced evidence showing threats against him by deceased, Williams, and others. He testified that he was afraid they would kill him, and that parties had attempted to waylay, and, as he believed, to assassinate him.

Defendant's reputation for truth and veracity was proved to be bad, especially since the prosecution for slander was instituted and since the killing of Williams by him.

A preliminary motion to change the venue was made by defendant upon both of the grounds specified in the statute. The evidence upon this motion is reproduced fully in the opinion of the court below. To this motion the State filed controverting affidavits to the affidavits of defendant's compurgators. These affidavits, among other things, stated that defendant's compurgators "reside in the extreme northern portion of Johnson County, and that they are not acquainted with the public sentiment of Johnson County, and have no means, or if any means, very limited means, of acquiring such knowledge; and they do not believe that said suppirting affiants are qualified to speak of the subject matter contained in the (their) affidavit." This controvertin affidavit was

signed by seven citizens who reside in different portions of Johnson County.

Defendant made a motion to quash the special venire. The court permitted the sheriff to amend his return and then overruled the motion.

*Lattimore & Browning,* for appellant, filed an able brief and also an able and elaborate brief and argument on the motion for rehearing, which, owing to their length, the Reporter regrets he can not reproduce.

*W. Poindexter, Finis E. Johnson,* and *Rob't A. John,* Assistant Attorney-General, for the State.—The record contains numerous bills of exception, which are grouped by the State in the following order:

Bills numbers 8, 9, 12, 13, 18, 22, 23 and 24 are practically germane to the same issue.

Bill number 8 objects to proof that defendant addressed the daughter of the deceased and was rejected by her. Bill number 9 objects to proof by the State that appellant slandered the daughter of deceased subsequent to his rejection by her. Bill number 12 objects to the daughter swearing the purpose of the visit of deceased to Cleburne the morning of the homicide. Bill number 13 objects to the State showing that the firm of Poindexter & Padelford prosecuted defendant in the slander case and were employed by deceased. Bill number 18 objects to the introduction of the complaint charging appellant with slander in that case against him, for imputing a want of chastity to the young lady he had addressed and had been rejected by, who was the daughter of deceased. Bill number 22 objects to the written statement of defendant in a memorandum book taken from appellant, reiterating the slander against the daughter of deceased, which was taken from him subsequent to arrest, and which had been written by appellant for the use of his attorneys upon the trial of the slander case. Bill number 24 objects to the evidence of the witness Thomas, to whom appellant repeated the slander against the daughter of deceased.

The State submits upon all these bills, that they were all germane to the issue of motive. The State submits as a sound proposition of law that when the motive, as shown in this case, depends upon the State demonstrating that the animus of defendant against deceased was brought about by certain prosecution instituted by deceased against defendant for slander of the daughter of deceased—that all facts which intensify that animus or which explain it, that is to say, all dependent and connecting circumstances which go to develop the motive, become relevant, provided they are logically connected with the motive. The different bills of exceptions synopsised as above, all are of the same kind. True, the twenty-second bill as to the memorandum book involves a different question, yet the State submits that the memorandum book was not inadmissible because it was a privileged communication, for the reason that it has been uniformly held that a privileged communication only

seals the lips of the attorney, and does not seal the lips of a third party; or testimony emanating from any other source, except from the testimony of the attorney, to whom the communication is made, which is alone privileged. It is not inadmissible because appellant was under arrest when the memorandum book was discovered and taken into possession by the officers. This is akin to the numerous authorities on wounds, etc., which defendant, even while under arrest, is forced to disclose, although incriminating in their nature. See Leeper & Powell v. State, 29 Texas Crim. App., 154.

Upon the general proposition of the testimony grouped in these bills, the State submits: that in order to intensify animus and explain it as a part of the res gestae of the homicide, animus being a constituent element of the homicide: See Hudson v. State, 28 Texas Crim. App., 323; Malcheck v. State, 32 Texas Crim. App., 219; Hall v. State, 31 Texas Crim. Rep., 565; Brown v. State, 24 Texas Crim. App., 170; Sullivan v. State, 31 Texas Crim. Rep., 486.

In proof that all the circumstances, though apparently collateral, which develop, explain and intensify the same, are admissible, the State submits the following propositions:

1. It is admissible to explain threats made, or the motive or reason of the homicide. Gonzales v. State, 31 Texas Crim. Rep., 508; 11 Am. and Eng. Enc. of Law, 514; Woods v. State, 37 Texas Crim. Rep., 459.

2. Evidence of the crime above objected to is admissible, because it explains and develops the motive which is a part of the res gestae of the crime of murder in the first degree as charged. In this connection the State quotes from Stephens' Digest on Evidence, which has been quoted with approval in the Morrison case, post, as follows: "The facts necessary to be known to explain or introduce a fact in issue, or relevant or deemed to be relevant to the issue or which support or rebut an inference suggested by any such fact, or which show the relation of the parties by whom any such fact was transacted, or which afford an opportunity for its occurrence or transaction, or which are necessary to be known in order to show relevancy or other facts, or deemed to be relevant in so far as they are necessary for those purpose respectively." Morrison v. State, 37 Texas Crim. Rep., 601; Wilkerson v. State, 31 Texas Crim. Rep., 86; Stepehens' Dig. Ev., 220; Spearman v. State, 34 Texas Crim. Rep., 279.

3. Evidence of the kind admitted in the bill of exceptions, supra, shows a course of conduct on the part of defendant intimately connected with his motive, which intensifies the same; and the logical culmination of which was the homicide committed, and is therefore admissible. Whart. Crim. Ev., sec. 42; Carroll v. Commonwealth, 84 Pa. St., 107; White, Code Crim. Proc., 1008.

The State submits that, in order to explain the threats made, to the effect that he would put the Williams family where the dogs would not bark at them; to explain the threats made to the daughter of the

deceased connected with the transaction which culminated in the homicide, to the effect that he did not propose to permit her to marry as long as he lived; to explain further the threat that if deceased prosecuted him or appeared as a witness against him in this case he would kill him; and to develop the motive the State had a right to show, not only that deceased had instituted a prosecution for slander against appellant for certain slanderous statements uttered by appellant against the daughter of deceased, but was authorized to show the nature of the slanderous statements uttered by appellant; the falsity of the slanderous statements; the reiteration of the slanderous statements, for the logical reason that, if appellant was conscious of his guilt in the slander prosecution, conscious that proof was ample; that he had imputed a want of chastity to the daughter of deceased which was false; and conscious that the State would be able to show that that imputation was not only made to one person, but could demonstrate the completed offense of slander; that is, that the imputation was made to divers other persons; that this very consciousness of guilt would intensify and explain the animus and malice that appellant had against deceased.

The State submits that, under the circumstances of the case, the trial court was authorized in permitting the State to fully explore the circumstances connected with the slanderous statements made and the prosecution pending against appellant for the same. But under the peculiar circumstances of this case, wherein appellant denies upon the stand that he had ever uttered a slanderous statement against the daughter of deceased, asserts his innocence as defensive matter, and as an excuse for the crime committed when he took the life of deceased— the State upon cross-examination, as shown by the explanation to the bills of exception, was certainly authorized to enter the field and join with appellant the issue that he himself had made.

Bill number 15 complains that the court erred in permitting the State to show the general reputation of defendant for a want of truth and veracity up to the very time of the homicide; and further that the court erred in not excluding said testimony, because said evidence of bad reputation was the result of the slanderous prosecution, as shown by the cross-examination of the witnesses testifying to the reputation.

The State submits that reputation as to the credibility of the defendant, tendered as a witness, exists up to the time of his testimony, the issue being whether he is credible at the time his oath is taken. The slander case being extraneous and independent of the homicide, certainly the mere fact that his conduct in that case brought him in bad repute for truth and veracity, is a matter to be explained upon cross-examination and left to the jury in a legitimate way, they being the judges of the weight of the evidence. If it had been shown that said reputation was caused solely by the homicide he had committed, and for which he was on trial, there might be some question; but the slander is an antecedent crime, and bad reputation springing from it existed as an affirmative fact, and could not be merely the conclusion

of the public as to appellant's guilt or innocence in the case for which he was here tried. Fossett v. State, 41 Texas Crim. Rep., 400.

Bill number 16 complains that the court erred in not permitting defendant to prove the good reputation of the witness Liedenberg, brother-in-law of defendant, for truth and veracity. As has been stated and as shown by the bill, there was no attack made upon this witness by the State. The examining trial testimony was simply shown to him to refresh his memory. This accomplished the purpose, and he rciterated the same testimony upon the trial of this cause that he had made upon the examining trial. There was therefore no contradiction. And unless there has been an assault made by the adverse party upon the witness in a manner that would affect his credit before the jury, the party tendering the witness is not authorized to bolster said witness by proof of good reputation.

Bill number 17 in reference to the argument made by State's counsel, which is objected to as misconduct, simply can not be considered, because there was no request made by special instructions asked on the part of appellant for the jury to disregard the same. Monticue v. State, 51 S. W. Rep., 236; Wright v. State, 37 Texas Crim. Rep., 146; Burke v. State, 47 S. W. Rep., 721; Norris v. State, 32 Texas Crim. Rep., 172.

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

Bill of exceptions number 1 complains of the failure of the court to quash the special venire, and the return of the officer thereon, "for the reason that there was no valid and legal order made and entered directing said venire, or describing same, or commanding that any particular number of men be summoned to attend the court at any particular day; and because the return of said venire did not show that such veniremen as purported to have been summoned were legally summoned, and did not show how they were summoned; and because all said veniremen named and selected in said writ were not summoned; and because the return of the officer purporting to have executed said venire was insufficient, and did not show any cause why certain veniremen were not summoned; and did not show what diligence, if any, had been used in trying to summon said venirement; that a large number of said veniremen, to wit, seven of same, appeared from said return to be not found; and that no diligence was shown by said return as to these veniremen, and no cause was shown for the failure to summon them." The court appends this explanation to the bill: "That the orders, writs, returns, and records will speak for themselves." We find the order of the court ordering the special venire, but the writs and return alluded to are not in the record. We note that appellant's contention is that the court permitted the sheriff to amend his return, and, as amended, said return reads, "Not found after diligent search." This would not be a ground for quashing the venire, even if the sheriff's

return were in the shape insisted upon by appellant. Gay v. State, 40 Texas Crim. Rep., 116; Furlow v. State, 41 Texas Crim. Rep., 12.

Bill number 2 complains that the court permitted the sheriff, after appellant's motion to quash the venire had been presented and over-ruled, to amend his return. This has been disposed of above.

Bill number 3 complains that after appellant had filed his motion for change of venue in proper form, the State filed its contesting affi-davits, to which defendant objected and demurred, and moved the court to strike the same out, for the reason that said contesting affidavits did not attack or question the credibility of the two credible citizens of Johnson County who had joined with defendant in making the affidavit upon which his application was based, nor the fact that said persons were not possessed of sufficient knowledge to enable them to make said affidavit. Without copying that portion of the State's contest com-plained of, we deem it sufficient to say that the contest is not subject to the objections raised by appellant, but we believe that the same is sufficient under the statutes in reference thereto.

Appellant, upon his application for change of venue, introduced the following testimony: W. F. Hoffman testified that he lives in the northern part of Johnson County, and is well acquainted with the peo-ple in the county, and thinks there exists so great a prejudice that ap-pellant can not get a fair and impartial trial. Has visited several communities in different parts of the county, finding in each of them great prejudice against appellant. Has heard other persons than those living in these communities express much prejudice against appellant. Remembers being at a meeting house in the Rock Creek community, in the northwestern part of the county. Heard this case discussed, and a great many of those present (in fact, most of them) expressed the sentiment that appellant ought to be dealt with without judge or jury. Met a man there named Moss, from the extreme western part of the county, and he expressed himself in the same way—that that was the way his people thought about it. Has heard the same opinion ex-pressed in gatherings in the Burleson, Pilgrim's Rest, and Pleasant Point communities. Witness is an uncle of appellant, and has lived in Johnson County thirty-five years. On cross-examination he stated that, altogether, he had only heard the matter spoken of five or six times; that he heard a man who run a barbecue stand in Cleburn ex-press his opinion that defendant ought to be hanged, and George Green, an attorney, stated that defendant had a bad case. Witness states that, with this exception, he could not name any person he had heard talking about the case in Cleburne; that he knew nothing of the sentiment of the people in the western, southern, or southeastern parts of the county, and little of the city of Cleburne; that Johnson County has a voting population of about 9000. James Rhea testified that he lived in the northern part of the county, and had lived there for many years. Was unable to say whether or not defendant could get a fair and impartial trial. Had heard the case discussed by a few men, and their expres-

sions were all against appellant. On cross-examination he stated that he was not acquainted at the county seat, and that his information as to the opinion of the people, even in his own community, near the town of Burleson, where defendant lived, was limited; that he would not pretend to say that defendant could not obtain a fair and impartial trial in Johnson County. William Matthews testified that he lived in the northeastern part of the county for a long time, and did not think that defendant could get a fair and impartial trial in that community, because of prejudice against him. Witness is not very largely acquainted outside of his community, which embraces a scope of country in the northern and northeastern part of the county, about six or seven miles square. Knows the people of that community are much prejudiced against appellant. On cross-examination he stated that he lived within two miles of W. F. Hoffman, with whom appellant had been boarding, in the northeastern part of the county; that his acquaintance in the county was not extensive, and had only heard twenty or thirty people discuss the case, and they lived in an area of six or seven miles square. W. K. Middleton testified that he was summoned as a special venireman. Lives north of Alvarado, and is well acquainted in Alvarado and that section of the county lying east of the Santa Fe Railway and north of Alvarado. Does not think defendant could get a fair and impartial trial at the hands of a jury summoned from that section of the county. Has heard a great many people express themselves as prejudiced against appellant. Heard them say that he ought to be mobbed. He further stated that he lived in about two miles of Burleson, in the northeastern part of the county, and had no acquaintance outside of his own section of the county, and could and would not say that in his opinion defendant could not obtain a fair and impartial trial in Johnson County. Lewis Jackson stated that he lived in the northeastern part of the county, and was well acquainted with the people in that section; that there is much prejudice against appellant there. On cross-examination he stated that there was some prejudice against appellant in the northeastern part of the county, where witness resided, but could not speak for the generality of the people even in his own section, and would not venture an opinion that defendant could not get a fair and impartial trial at the hands of a jury selected in his own county. D. A. Branson testified that he was summoned as a special venireman. Lived at Burleson, and attended strictly to his own business. Had heard this case discussed in his community, and the people appeared to be against appellant. Take the section of country east of the Santa Fe Railway and north of Alvarado, and witness believes a jury could be obtained from that section that would give defendant a fair and impartial trial. On cross-examination he further stated that he thought that appellant could obtain a fair and impartial trial in Johnson County. O. G. Selman testified that he lives east of Egan, in Johnson County, and is fairly well acquainted in the county. Does not think appellant could get a fair and impartial trial in the county. Has heard quite a num-

ber of men express themselves about the case, and, by their expressions, they were against appellant. Some of the people thought he ought to be mobbed. Can not say the prejudice is against defendant as an individual, but is against the case as they have heard it. On cross-examination, that he lived near the town of Burleson, in the northeast part of the county, and about one mile from Bethesda Church. Never heard the case discussed in Alvarado, in the eastern part of the county, and would not say that defendant could not obtain a fair and impartial trial in Johnson County, nor by a jury selected from the northeastern part of the county. F. B. Baillio testified that he is the editor and proprietor of the Johnson County Review, a weekly newspaper published in that county. At the time of the homicide herein charged, the circulation of the paper was from twelve to fifteen hundred, and witness thinks the paper circulated in every post office in the county. Besides witness' paper, there were the Enterprise, Chronicle, and Cleburne Herald. Witness·identified the copy of the paper handed him, giving an account of the killing. The copy alluded to contained an inflammatory article about the killing, giving as near as obtainable at that time the facts of the same. H. C. Floyd stated that he married appellant's half-sister, and lived in Cleburne. This case was talked·of a great deal in Cleburne, and he heard a good many men express their prejudice against defendant. It is a fact that he could not get a fair and impartial trial here, because of the prejudice. On cross-examination the witness stated that he would not pretend to say that appellant could not obtain a fair and impartial trial in Johnson County, for he did not know the sentiment of the people at -this time, as for quite a while he had been out of the county. Will Haynie testified that he was a peddler, selling dry goods from a wagon, and buying produce, and that his route lies in the northeastern and southeastern part of the county. Brings his produce to Cleburne and sells it. Has heard people in all the different communities which he visited express their prejudice against appellant. Some of the people were women, and some men. Does not think, from what he has heard, that appellant could get a fair and impartial trial. On cross-examination, however, he states that he would not say that, in his opinion, defendant could not obtain a fair and impartial trial in Johnson County, nor at the hands of a jury selected from the section of country he had traveled. In addition to the foregoing testimony, the State offered to place witnesses on the stand to prove that there was no prejudice against appellant; that there was no dangerous combination against him, as alleged by appellant. But, the court being satisfied the motion for change of venue should be denied, the court refused to hear any evidence offered by the State. This last statement is an explanation attached to the bill by the court. We do not think that the facts as above detailed show that appellant could not get a fair and impartial trial, under the laws and Constitution of this State, in Johnson County at the time of this trial. The evidence discloses that whatever prejudice there might

have been, as far as the record shows, was confined to the northeastern part of the county. The county contains 9000 voters, and the witnesses who testified for appellant are nearly all from the northeastern part of the county, where the parties to the tragedy had formerly lived. Some of the witnesses introduced by appellant himself stated that they would not swear that a fair and impartial jury could not be selected in the immediate vicinity where the killing occurred. We find nothing in this bill of exceptions to indicate that there exists any combination of people or any prejudice in Johnson County, such as would likely deprive appellant of a trial fair and impartial, according to the laws and Constitution of this State.

Bill number 5 complains that the State, on cross-examination of O. G. Selman in reference to the change of venue, asked, "Is it not the prejudice existing against the case, and not against appellant as an individual?" There was no error in permitting this question to be asked. In Meyers v. State, 39 Texas Criminal Reports, 500, we held that the provisions of article 615, Code of Criminal Procedure, for changing the venue where there exists so great a prejudice in the county against the accused as to render it improbable that he can obtain a fair and impartial trial, embrace both the prejudice against the accused and prejudice arising from prejudgment of his case. The single and only purpose of this statute is to secure to the accused the right of a fair and impartial trial, which is a fair trial by an impartial jury, guaranteed by the Bill of Rights. The prejudice mentioned in the article is such prejudice against the accused himself, or a prejudgment of his particular case or crime. It may be either, or it may be both.

Bill of exceptions number 8 objects to proof on the part of the State that appellant had addressed the daughter of deceased, and been rejected by her. Bill number 9 objects to evidence by the State that appellant slandered the daughter of deceased subsequent to said rejection. Bill number 12 objects to the daughter stating the purpose of the visit of her father (deceased) to Cleburne the morning of the homicide. It appears from the last bill that deceased was a witness in a prosecution against appellant, to be tried that morning, for slandering his daughter. Bill number 13 complains that the State was permitted to show that the firm of Poindexter & Padelford prosecuted appellant in the slander case, and were employed by deceased. Bill number 18 complains of the introduction of the information charging appellant with slander in that case, which information charges that appellant imputed a want of chastity to the young lady he had addressed, and by whom he had been rejected, who was the daughter of deceased. Bill number 24 objects to the evidence of the witness Thomas, to whom appellant repeated the slander against the daughter of deceased. The State's theory is that appellant had addressed the daughter of deceased, and had been rejected by her, and he then began to slander and impute a want of chastity to said daughter; that thereupon the father of the girl had a prosecution against appellant instituted for said slander;

that appellant had threatened to kill deceased if he persisted in prosecuting him, and stated that he would kill him, if he had to do so in the courthouse. We think that the testimony complained of in said bills was admissible upon the issue of animus and motive actuating appellant at the time of the homicide, as well as to contradict appellant's contention, to wit, that he had not slandered the daughter of deceased. While it is not always necessary to prove motive for the homicide, yet it is always proper to do so, and the mere fact that in doing so a separate and independent crime may be established or proven does not render proof of such motive inadmissible. Hudson v. State, 28 Texas Crim. App., 323; Brown v. State, 24 Texas Crim. App., 170; Hall v. State, 31 Texas Crim. Rep., 565; Melcek v. State, 33 Texas Crim. Rep., 14; Sullivan v. State, 31 Texas Crim. Rep., 486; Hamblin v. State, 41 Texas Crim. Rep., 135. Said testimony is also admissible to explain threats made by appellant. Gonzales v. State, 31 Texas Crim. Rep., 508; Woods v. State, 37 Texas Crim. Rep., 459.

Appellants also complains because the court overruled his second application for continuance. Without reviewing the evidence sought to be obtained by said application, we deem it sufficient to say that we do not think there is any error in overruling the same, since the same does not comply with the statute on the question of diligence, and the testimony is not material, and not probably true.

Bill number 7 complains that the court forced appellant to exhaust one of his peremptory challenges upon a juror, which juror stated on his voir dire that, from hearing this case talked and read about in the newspaper, he formed his opinion, soon after the killing, nearly a year ago; that he is a man whose opinions are not easily changed; that he has the same opinion now in his mind, and, if taken as a juror, would go in the jury box with it; that it would take evidence to change such opinion; that he is of opinion that he could try the case, and not be influenced by that opinion, and would not be inclined to accept more readily as true evidence in accord with that opinion, nor to reject that not in accord therewith. Whereupon appellant challenged the juror on two grounds: That he came from that section of the county where many of defendant's compurgators had testified that there existed great prejudice against appellant, and, further, that said juror had an opinion concerning this case. The bill fails to show that appellant at any time exhausted his peremptory challenges. Hence no error is shown.

Bill number 10 states that, while Andy Woodson was on the stand for the State, he was asked by defendant's counsel if, on a certain Sunday, at Bethesda Church, he did not make threats against defendant, which the witness denied. The State, on direct examination, asked witness what was said by defendant in said conversation at Bethesda Church, to which defendant objected because no part of such conversation had been elicited by defendant; that said answer, as to himself, would be immaterial and irrelevant and incompetent to any issue, and would tend to prejudice the rights of defendant and inflame the minds

of the jury against him. The objections being overruled, witness stated: Appellant "asked me if I had heard the Williams girl say anything about him. I answered, 'No.' And he said, 'Whenever a girl goes far enough to let me get rubbers and have carnal knowledge of her, and treat me as she has treated me, it beats the devil.' And he further said he did not intend that Nora should marry any other fellow as long as he lived." The court, in his explanation, states: "The State placed Andy Woodson upon the stand, and proved by him that, the day after defendant was arrested in the slander case, he came by the residence of deceased, stopped at the gate, made certain statements at the house —tried to get to see deceased, to have a conversation with him, as appears by the statement of facts. Thereupon defendant's counsel took said witness in charge, and proceeded to interrogate him as to various matters touching the chastity of Nora Williams and the other Williams girls—asking him if he did not state to defendant at one time that he had got all out of Hattie Williams himself he wanted, and he did not intend to go with her any more; that the whole Williams family were on it; that Nora Williams was not right; that she had been too intimate with several of the boys. He was further asked if he had not advised defendant not to marry Nora Williams, and touching the slanderous charge contained in the information, and if he had not stated to defendant, at Bethesda Church, about two months after his (witness') marriage to Hattie Williams, that he had told old man Williams about Nora, and that old man Williams was going to kill defendant, and that he (witness) would aid him, if necessary. During the first of this cross-examination, the State made objection to same, and stated to the court, if defendant's counsel persisted in making inquiries of the witness, State's counsel would claim the right to cross-examine him fully on said matter, whereupon appellant stated he was willing and ready to inquire and to make the issue as to whether the witness Woodson or defendant had uttered the slanderous charges against the Williams girls, and proceeded to ask said questions, whereupon, on crossexamination, counsel asked witness to state all that was said between him and defendant in the conversation at Bethesda Church." The explanation attached to this bill of exception shows that the same was clearly admissible.

Bill number 11 states that, while W. F. Hoffman was on the stand, appellant asked the question and would have proved the fact that, prior to the making of any slander charge against defendant, defendant told witness (defendant's uncle) that Andy Woodson (the party who afterwards made the complaint charging defendant with slander, and a State witness) had made slanderous statements against Nora Williams, and offered to prove the further fact that defendant told said witness that he did not believe said statement to be true. This evidence is pure hearsay, and would have been partly self-serving.

Bill number 14 states that while Andy Woodson was on the stand, for the State, he was asked, "Did you ever see anything wrong with

these girls?" to which defendant objected on the ground that the truth or falsity of the alleged slanderous charge was not an issue in this case, and because said statement referred to other parties than the alleged slandered female, and because the fact as to whether said witness had or had not seen anything wrong with these girls would not shed any light upon any issue in this case. The objection being overruled, witness answered, "No, sir." The court appends this explanation: "Counsel for defendant has asked witness Woodson if he himself had not made different charges of slander against these girls, and if he had not told defendant that other parties, including himself, had been intimate with the Williams girls, and if he was not the first party that started slanderous charges against these girls, all of which the State objected to; counsel for State stating to the court at the time that, if counsel for defendant persisted in pressing said investigation and forcing said witness to answer said questions, the State would insist on a full cross-examination of the witness on the matter about which counsel for defendant was interrogating said witness. Thereupon the court stated to defendant, if he desired to press said questions, he could do so, but the State should have the right to cross-examine said witness fully on said matters. Counsel for defendant continued to ask said witness various questions touching his supposed slanderous statements about Nora Williams and the other Williams girls," etc. With this explanation, we think the objections of appellant are without merit, and no error is shown.

Bill number 15 complains that the court permitted the State to ask various witnesses the following question: "Are you acquainted with defendant's general reputation in the community where he resided, prior to this homicide, for truth and veracity at this time?" to which defendant objected for the following reasons: That he had been confined in the county jail of Johnson County for a year upon this charge of homicide; that he had not been in a position during said time to make or unmake such reputation; that it was improper and unfair and greatly prejudicial to defendant to permit his reputation at this time to be testified about; and that the inquiry ought to be confined to the time anterior to the homicide; and that such reputation was bad at this time was the sole result of this homicide and the slander charge immediately preceding—which objections were overruled, and each of said witnesses permitted to state that defendant's present reputation in the respect inquired about was bad, whereupon defendant asked each of said witnesses if defendant had not always borne a good reputation in such respect prior to this homicide and the slander trouble immediately preceding it, to which said witnesses each answered affirmatively, and defendant's counsel asked them if they had ever heard anything against defendant's reputation in that respect, except in connection with the aforesaid mentioned murder and slander charge, and they answered that they had not, whereupon defendant moved to exclude the testimony of each of said witnesses as to what his present reputation was in such

respect, which the court refused to do. This bill is allowed, with the explanation "that defendant was placed upon the stand and testified in his own behalf, and the question was whether defendant's reputation at the time he was testifying, for truth and veracity, was good or bad, and whether he was entitled to belief at the hands of the jury upon his oath. And the court admitted this evidence, believing same was material; at the same time allowing defendant the privilege of showing the character of his reputation prior to the time he became involved in the slander charges in relation to Miss Nora Williams. The fact that defendant's conduct towards the young lady was such as to bring his reputation for truth and veracity in question could not, in the opinion of the court, deprive the State of proving the nature of that reputation at this time, when the sole question was whether defendant was entitled to belief upon his oath at the time he testified." We think that this explanation of the court shows that the ruling of the court in the particular complained of was not erroneous. Where appellant takes the witness stand, it is germane and proper to permit witnesses to be introduced to prove what the reputation of appellant is at the time of his testifying. Certainly the fact that the reputation appellant might then have was perhaps caused from some previous act of his would not make the testimony inadmissible. Fossett v. State, 41 Texas Crim. Rep., 400.

Bill number 16 complains that the court erred in not permitting appellant to prove the good reputation of witness Ledenberg (who was a brother-in-law of appellant) for truth and veracity. An inspection of the bill shows that State's counsel, on cross-examination, asked witness if he had not made a certain statement. Witness answered that he did not remember whether he made such statement, whereupon State's counsel produced the written testimony of the witness taken upon the inquest of deceased, and read from same, and asked witness if he did not make the statements read, and if he did not make them under oath, to which witness replied that "he might." Thereupon the State's counsel handed him the written statement, asked him to read therefrom what his written statement was on the inquest, and then asked witness if what he stated at the inquest, which was different from that on the trial, was not true; and the witness stated that, if it was in there, it was true. This is not contradicting the witness, but simply refreshing his memory, and hence did not authorize appellant to introduce evidence to bolster up his reputation for truth and veracity. Spangler v. State, 41 Texas Crim. Rep., 424; Binyon v. State (Texas Crim. App., Dallas Term, 1900), 56 S. W. Rep., 339.

Bill number 17 complains of the argument of State's counsel. The objection, however, can not be considered, because no special requested instruction was asked by appellant to the effect that the jury should disregard the statements, even conceding the statement to be improper. Monticue v. State, 40 Texas Crim. Rep., 528; Levine v. State, 35 Texas Crim. Rep., 647; Wright v. State, 37 Texas Crim. Rep., 146.

Bill number 18 complains that the court erred in this: The State offered in evidence the complaint made by Andy Woodson, and the information, dated January 27, 1899, in which defendant was charged with uttering certain slanderous language to Andy Woodson of Nora Williams. Appellant objected to said testimony on the ground that the same was irrelevant and immaterial for any purpose, and tended to prejudice the minds of the jury against defendant, and did not show or tend to show that defendant killed M. M. Williams, nor that he bore any malice towards M. M. Williams; and for the further reason that the complaint was not made by said M. M. Williams; that said Williams was not a witness to any fact in said slander trial. The court appends this explanation to the bill: "That deceased, M. M. Williams, was a witness in the slander case, and a subpoena showing he was summoned as a witness in said case by the State was introduced in evidence in connection with the complaint and information. It was also shown by other witnesses that deceased was a witness, and had come to Cleburne on the morning of the homicide in obedience to said subpoena. The court admitted the complaint and information in connection with said subpoena for the purpose of showing motive on part of defendant for the commission of the homicide, and for no other purpose. That neither of said instruments was read to the jury, and the jury were not permitted to read either of said papers, and the purpose of said evidence was limited in the court's charge." We think that this explanation shows that the evidence was clearly admissible.

Bill number 22 states: "When defendant was on the stand in his own behalf he was asked by the State's counsel if he did make in writing the statements contained in certain blank books then exhibited by counsel for State, to which defendant objected, and asked that he be allowed to ask some preliminary questions concerning same, which being granted, defendant's counsel asked him if said blank books were not taken from his person after the homicide, and while he was under arrest and unwarned, to which defendant answered that such was the fact; that he had made said written statements in said blank books for the sole and only purpose of giving the same to his counsel for the use and information of said counsel when trying the then pending slander case. Whereupon defendant's counsel then objected to any question or answer in reference to the contents of said written statements, for the reason that the same was a privileged communication, made by defendant while under arrest and unwarned, and was inadmissible, irrelevant, and immaterial for any purpose, which objections being overruled, appellant stated that he wrote the statements in the books about two weeks before he got into this trouble, and part of it the night before the killing; that he wrote in said books that he had intercourse with the girl; that this statement was true." The explanation of the court to the bill is that defendant had repeatedly stated, in answer to questions propounded by counsel, that the slanderous statements imputed to him were untrue, and that he had never made any such state-

ment about Nora Williams; that he had sought a meeting with deceased, Williams, to convince him that he was innocent of all such charges. Whereupon State's counsel asked if he did not write the matters in said books, and defendant admitted that he did. The court did not allow any of said written matter in evidence to the jury, and, notwithstanding all of said matters were put in evidence by defendant himself, the court charged the jury not to consider any evidence connected with said slander, except as tending to show motive. We do not think that the evidence above elicited comes within the rule of privileged communications. There is no pretense that anyone except appellant testified about this matter. Certainly a statement that appellant may have prepared, which he intended to give his counsel the next day, which statement is found upon his person when arrested for this homicide, could not be regarded as a privileged communication. And furthermore, the testimony was admissible for the reasons stated by the court.

Appellant's special charge number 1 complains of the court's failure to charge on manslaughter. The evidence, in our opinion, does not raise the issue.

Special charge number 2 is as follows: "You are further instructed that if, at the time defendant shot and killed M. M. Williams, it reasonably appeared to defendant, from his standpoint at the time, viewed in the light of all the facts and circumstances as they then appeared or were known to defendant at such time, that he was in immediate danger of serious bodily harm or of loss of life at the hands of deceased, or of deceased and other person or persons acting with deceased, then you will acquit defendant." We do not think that there is any evidence raising this issue. On the issue of self-defense, the court charged the jury on the law applicable to the facts. The testimony of appellant is, in substance, that deceased had made an assault upon him with a rock, and was continuing said assault at the time of appellant's shooting, and this phase of the law is submitted in the charge. There is no testimony presenting any other character of danger than an immediate effort on the part of deceased to do appellant bodily harm. Hence there was no error in the court refusing appellant's special charge number 2.

Special charge number 3, so far as the same is applicable, was covered by the main charge of the court. The evidence is conclusive to our minds that appellant is guilty as charged in the indictment; that the killing was the legitimate outgrowth of wanton slander upon the fair name of the daughter of deceased, and that appellant at the time he fired the shot had no reason to fear, and in fact did not fear, any character or kind of assault upon his person; that the killing was upon express malice aforethought, and appellant deserved the highest penalty of the law. The judgment is therefore in all things affirmed.

*Affirmed.*

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion on May 9, 1900.—Reporter.]