ALBERT L. TROTTER v. THE STATE.

*No. 843.    Decided June 10th, 1896.*

### 1.   Juror—Voir Dire Examination—Formed Opinion—Competency.

On the voir dire examination of a juror as to his qualifications, where the juror stated that he had an opinion as to the guilt or innocence of the accused which he thought would not influence his verdict; but that he would have to hear evidence to change his opinion; and, the court asked him, whether his opinion was formed from talking with the witnesses or from rumor and hearsay (?); and he answered, it was from rumor and hearsay, and, that, notwithstanding the opinion, he could go into the jury box and render an impartial verdict according to the law and the evidence. Held: The juror was competent. Following, Suit v. State; 30 Tex. Crim. App., 322.

### 2.   Same.

Where on his voir dire examination, the juror stated, he had formed an opinion as to the guilt or innocence of defendant, and stated, it was formed from tal'king with the witnesses in the case, whereupon the court sustained the challenge of the District Attorney to said juror, and defendant excepted. Held: The ruling of the court was correct under the statute. Code Crim. Proc., Art. 673, Subdiv. 13. Following, Shannon v. State, 34 Tex. Crim. Rep., 5.

### 3. Placing Witness Under "The Rule"—Remarks of District Attorney.

When the witnesses were placed under the rule, the District Attorney remarked, "I demand the strict rule, because I believe there are witnesses here who would not regard the rule unless strictly enforced." Held: While such a remark was improper, it cannot be seen how it affected the rights of defendant injuriously, inasmuch as the remark did not single out defendant's witnesses, but applied to all the witnesses.

### 4. Murder—Evidence—Opinion Evidence—Res Gestæ.

On a trial for murder, where the brother of deceased testified; that after the killing, defendant left, and that as he, witness, started off to get some one to come and stay with the body, one C., a companion of defendant's was "watching him (witness) as long as he was in sight." Held: The evidence was not objectionable as opinion evidence, but was the statement of a fact, and, being res gestæ, it was admissible notwithstanding defendant had fled from the place, his companion C., being at the time still in proximity to the scene of the homicide. Moreover, the testimony was withdrawn by the court at the instance of defendant, and the jury instructed to disregard it; and, if it had been inadmissible, it was of such a character that error in its admission would have been cured by the withdrawal.

### 5. Same—Putting an Eye-Witness on the Stand.

On a trial for murder, the State is not required to put an eye-witness upon the stand simply because he was an eye-witness to the transaction.

### 6. Improper Argument—Practice.

Improper argument of counsel will not be revised on appeal, where no request was made, at the time, to have the court instruct the jury to disregard the same.

### 7. Same—Uncommunicated Threats—Charge.

Where the court, in effect, instructed the jury, that they could look to uncommunicated threats in order to ascertain who may have made the first hostile act or demonstration; and, further instructed that, if deceased or his brother made the first hostile act or demonstration, defendant was justified. Held: The charge could not be complained of by defendant.

### 8. Same—Impeaching Evidence—Charge.

Where there was no affirmative testimony of an impeaching character introduced against defendant that required a charge limiting it to its legitimate purpose, and the court, in effect, instructed the jury, that, "notwithstanding testimony had been introduced tending to impeach the witnesses, the credibility of the said witnesses was a question for the jury. Held: The charge was sufficient.

APPEAL from the District Court of Bandera. Tried below before Hon. EUGENE ARCHER.

Appeal from a conviction for murder in the second degree; penalty, fifteen years' imprisonment in the penitentiary.

The indictment charged appellant with the murder of Joseph Allsup, on the 25th day of February, 1893, by shooting him with a pistol.

The deceased was a youth about seventeen years of age, and the killing took place about one-half or three-quarters of a mile from the house of appellant. At the time of the difficulty, Joe Allsup was accompanied by his brother, Robert, a lad of some fourteen years of age, and Trotter, this appellant, was accompanied by one John Creswell. It seems that these parties had lived some time as neighbors in Bandera County, and that Trotter had bought out the land and stock of Tom Allsup, the father of the boys, and the family moved to Edwards County. There are some indications of trouble between the parties before the Allsup's moved, but what it was cannot be learned from the re-

cord. There was testimony, however, to the effect, that before the parties moved back from Edwards to Bandera, the two boys had stated, that they had heard that Trotter and Creswell had charged them with stealing; and, they were going to move back, and that they intended to kill Trotter. But, these threats had never been communicated to Trotter. There is no evidence that the parties had met from the time the Allsup's moved back until the day of the homicide. On that day, the two Allsup boys started from home to go to one Buckalews, some twelve or fourteen miles, to get some sugar-cane seed for planting purposes. They were on horseback, and each of them had a gun which he was carrying in a scabbard fastened to his saddle. Their road to Buckalews led them by Trotter's house. The testimony is voluminous, but the State's case will be seen from the testimony of Robert L. Allsup. He testified: "We passed Trotter's house and went between Trotter's house and the new cow-pen. As we passed Trotter's house, we saw John Trotter and a little girl at the pig-pen. When they saw us, they went in a fast walk towards the house. I saw two horses hitched at the yard fence. We passed Trotter's house, within twenty or thirty steps from the house, crossed the hollow and went on up the ridge. When we got up on the ridge, about a quarter of a mile from the house, I looked back and saw Trotter and Creswell get on their horses and start off down the trail towards the spring. They went off down the trail we were in. The trail left the house in a different direction from the direction in which we left the house. We were up on the point near the corner of the pasture when I looked back and saw Trotter and Creswell get on their horses and start down toward the spring. They overtook us on the mountain, about one mile from Trotter's house. We were traveling down grade when they overtook us. When they came up, we spoke to them and they spoke to us friendly. We said, 'howdy,' and they said, 'howdy.' We then rode on together. Creswell then said, 'Which way are you boys going?' We told him, 'we were going down the creek.' He then said, 'Whereabouts down the creek?' We told him we were going to Buckalews' after cane seed to plant.' He then asked: 'Where are you going to plant them?' We said: 'We are going to plant them at Boardtree.' I then asked Creswell where he was going? He replied: 'By God, I am out looking after my hogs, to keep them from being stolen.' I then said: 'You don't think we would steal your hogs, do you?' He replied: 'No, I don't know who might steal them.' We then rode on apiece. I was in front, Trotter and my brother Joe were in the middle, and Creswell was behind. Trotter then commenced talking to Joe, and said: 'What in the hell are you boys scouting around here about?' Joe said: 'We are not scouting around here.' Trotter said: 'It looks mighty like it, two of you come riding by the house with your guns.' Joe then said: 'He would ride round when he got ready.' They then had a few more words together. Trotter then said: 'If you want anything out of me by God you can get it.' At this time my brother was riding just out of the trail on the right hand side,

and Trotter was riding on the left hand side of the trail and to the left and a little back of my brother. Trotter was about eight or ten feet from my brother. Trotter then pulled his pistol and commenced shooting at my brother. His first shot missed my brother. The second shot hit him. My brother was doing nothing when Trotter shot at him. He was riding along straight up in the saddle, leaning his weight on his right foot. He had his bridle in his right hand and had his left hand up. My brother fell off his horse, at the second shot, on the side he was leaning. My brother never had his gun in his hand when he was shot. After Trotter shot the second shot at my brother, he said to me: 'You damned little son-of-a-bitch, you need not try to get away, I will kill you;" and turned and fired at me. I got off my horse as quick as I could, and got my gun out. He fired at me twice before I got off my horse. He then ran by me and fired at me, and I shot at him. He then ran off down the hill and got off his horse. I followed him about twenty or thirty steps. When he got off his horse he shot at me again. I shot at him just before he got off his horse. After he got off his horse and shot at me, I shot at him again. He got behind a tree and shot at me with his Winchester, the bullet struck the tree I was behind and cut a twig off over my head. When he got off his horse, he got his Winchester out of the scabbard. He was about sixty yards from where I was standing behind the tree when he shot back at me. He was then behind three black-jack trees. I went towards where he was two or three steps, and he wouldn't come out. I then went to where Joe was. Creswell was going back up the trail about forty or fifty yards from Joe. I never saw Trotter any more that day. When I got back to where Joe was, he was straightened out, lying on his back, dead. I hallooed at Creswell, who had got back up the trail about 100 yards, going towards Trotter's to come back. He came back to where my brother was." (Here counsel for defendant objected to State's proving what was said and done by the witness and Creswell after they got to the body of deceased, the defendant not being present, and the court overruled the objection and permitted the witness to testify as follows:) "I tried to get Creswell to help me put my brother on a horse and take him home, but he would not. I then tried to get him to stay with my brother until I could go after somebody to stay with him, but he would not stay. Me and Creswell did nothing with the body. I started off to get somebody to stay with the body. Mr. Creswell went up the trail we came about three hundred yards, on the ridge, and watched me. I could see Creswell for about one mile after I left. He stayed there on the ridge and watched me all this time." (Counsel for defendant here again objected to this testimony, "because of the absence of the defendant; because it was no part of the res gestæ; because that portion, relative to the watching, was a mere conclusion of the witness; because said testimony was wholly irrelevant, and because it was calculated to prejudice the rights of defendant." The court overruled the objection, excepting in so far as it related to Creswell's

having watched the witness, but sustained the objection in so far as it related to Creswell having watched the witness, as being a conclusion of the witness, and instructed the jury verbally not to consider that portion of the testimony, to which ruling of the court in not excluding all of said testimony, defendant excepted.) "My brother's gun was on his horse and in the scabbard at the time he was shot. The pistol that Trotter had was a big sized pistol."

The State did not put Creswell upon the stand as a witness. And defendant moved the court to compel the prosecution to do so, which the court refused, and defendant saved a bill of exceptions to this action of the court.

It was proved that the defendant (appellant) fled immediately after the commission of the crime and was not arrested for months afterwards.

[No brief for appellant.]

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and given fifteen years in the penitentiary, and prosecutes this appeal. Appellant excepted to the action of the court in overruling his challenge for cause as to the juror, D. C. Cox. As to said juror the bill shows as follows: "The court propounded to the juror the statutory questions, to-wit: 'From hearsay or otherwise, is there established in your mind such a conclusion as to the guilt or innocence of the defendant as would influence you in finding a verdict?' The juror replied, 'I have formed an opinion.' The court then asked the juror 'if it was such an opinion as would influence his action in finding a verdict.' The juror said, 'I do not think it would.' The court then told the juror he would have to say positively whether it would or not. The juror then said it would not. Counsel for the defendant then asked the juror if he still had that opinion. He replied that he still had it; and in answer to further questions by counsel for the defendant the juror said: 'I cannot go into the jury box free from that opinion, and I will have to hear evidence before I can change that opinion.' The court then asked the juror if his opinion was formed from hearing the witnesses talk about the case or from rumor and hearsay. The juror said it was from rumor and hearsay, and that, notwithstanding the opinion, he could go into the jury box and render an impartial verdict according to the law and the evidence. Thereupon the court, over the objection of the defendant, held the juror competent, and the defendant was compelled to exhaust a peremptory challenge upon said juror, and the defendant afterwards exhausted all of his peremptory challenges before the jury was formed." This action of the court is assigned as error. Under the former decisions of this court we hold that the juror was competent. See, Suit v. State, 30 Tex. Crim. App., 322. The second bill of exceptions relates to the sustaining of a challenge to a juror, made by the

District Attorney. The juror, in response to an examination by the court, fully qualified as a juror, and stated that he had formed no opinion as to the guilt or innocence of the defendant that would influence him in finding a verdict. The District Attorney then asked said juror if he had formed any opinion as to the guilt or innocence of the defendant, to which the juror replied: "I have." The District Attorney then asked the juror if he had formed that opinion from talking to the witnesses in the case. The juror replied that he had. The court then asked the juror, "Do you say that you formed that opinion from conversing with the witnesses in the case?" The juror replied, "I do." Thereupon the court sustained the challenge of the State for cause, and said juror was discharged, to which the defendant excepted. The statute seems to make a difference between an opinion formed by a juror from hearsay merely and where the juror has formed his opinion from having heard the testimony, or from having conversed with the witnesses in the case. This distinction has been recognized by this court. See, Shannon v. State, 34 Tex. Crim. Rep., 5. No injury is shown to appellant in the action of the court, and there was no error in sustaining the challenge for cause. Counsel for appellant excepted to the remarks of the District Attorney when the witnesses were placed under the rule. Said remarks were as follows: "I demand the strict rule, because I believe there are witnesses here who would not regard the rule unless strictly enforced." This remark did not single out the defendant's witnesses, but was applied to all of the witnesses. It was not a proper remark to suggest that all or any of the witnesses would not comply with the rule unless it was strictly enforced. When the District Attorney had asked for the rule, and requested the court to instruct the witnesses in regard thereto, he had performed his duty; and when the District Attorney had done this he should stop. However, we cannot see how the remark may have affected the rights of the appellant injuriously, and the bill does not show that it had this effect. On the trial of the case the State proved by the witness, Robert Allsup, that after the difficulty the defendant left the scene of the difficulty; that he (Allsup) left the body of his brother in the road where he had been killed, and started off to get some one to come and stay with his brother's body; that John Creswell, who was with the defendant at the time of the homicide, and who had come there with him, had ridden off several hundred yards, and that the said Creswell remained there on his horse, as long as witness was in sight, and he stated that Creswell was "watching him." This latter expression, on objection by appellant, was excluded. Appellant, however, contends that it was improper testimony, and was calculated to affect the defendant injuriously, and its effect could not be thus withdrawn from the jury. The court, in his explanation of the exclusion of said testimony, says that this was a mere opinion of the witness. In our opinion, the evidence was not objectionable on this ground. A witness can testify as to whether he was being watched or not, and his evidence is not an opinion, but a fact. How-

ever, appellant contends that, if it was admissible at all, it was only admissible on the ground that Creswell and Trotter were co-conspirators, and, the conspiracy having ended with the death of Joe Allsup, the testimony was not admissible against his codefendant, Albert Trotter. If it be conceded that the conspiracy had ended, still this testimony appears to us to be admissible as a part of the res gestæ. It was very shortly after the homicide had been committed by Trotter, who had fled from the place, but Creswell had not left, but remained in proximity to the scene of the homicide. Again, this testimony was withdrawn as soon as the court's attention was called to it, and the jury instructed to disregard it. The testimony must be shown in such case to be more than merely improper evidence; it must be prejudicial. As was said in Miller v. State, 31 Tex. Crim. Rep., 609, "It is not intended to hold that cases may not arise in which the withdrawal of testimony would not cure the error committed in admitting the same, for it may occur that such evidence was of such a prejudicial character as to so influence the jury against the defendant that he would be deprived of a fair and impartial trial." The evidence admitted and excluded in this case does not appear to us to be of such character.

The contention of the appellant that the State should have put Creswell on the stand because he was an eye-witness to the transaction is not the law. See, Gibson v State, 23 Tex. Crim. App., 414; Kidwell v. State, 35 Tex. Crim. Rep., 264; Reyons v. State, 33 Tex. Crim. Rep., 143. Appellant contends that error was committed by the District Attorney in his closing argument by traveling out of the record and in indulging in certain remarks. It is sufficient to observe in this connection that the remarks complained of do not seem to be hurtful, and no request was made by the appellant to have the court instruct the jury to disregard the same, which, under the decisions of this court, should have been done before the appellant can avail himself of this matter. Appellant excepted to paragraph No. 22 of the court's charge, which is a charge presenting the theory of the defendant having provoked the difficulty. His contention is that such charge is not applied to the facts of the case. We have examined this ahorge, and in our opinion it, in connection with the other charges on self-defense, presents all of the law bearing on the subject, as shown by the facts. The law of self-defense, we think, is fully presented in the charge in every phase that the evidence required. And in that portion of the charge predicated on a demonstration by Joe Allsup with a gun the charge directly applies the law to the evidence in the case; and the charge also instructs the jury that the defendant could rely on a demonstration by either Joe Allsup or his brother, Robert. We fail to see any cause of complaint as to the court's charge on self-defense. Appellant also complains of the court's charge on threats. Said charge is as follows: "Evidence of threats (if any) made by the deceased and his brother, Bob Allsup, or either of them, and not communicated to the defendant, are not to be considered by you in justifica-

considered as a circumstance tending to explain the acts of the deceased and said Bob Allsup at the time of the killing, and as a further circumstance tending to show whether or not they may have commenced the difficulty at the time of the killing." In the first portion of said charge, if there was nothing further said, the charge would certainly be erroneous, but in the latter portion thereof, the very object and purpose of the admission of uncommunicated threats is stated; and this charge, in connection with the charge on self-defense given in the case, which the jury were authorized to look to, could not have misled or confused them. They were instructed to look to uncommunicated threats in order to ascertain who may have made the first hostile act or demonstration, and they were instructed, if the deceased or his brother made the first hostile act or demonstration, that the defendant was justified. Appellant insists that the court erred in not stating to the jury the purpose for which the impeaching testimony was introduced. There was no affirmative testimony of an impeaching character introduced against the defendant that required of the court a charge limiting the same to its legitimate purpose. The effect of the court's charge on this subject was simply to instruct the jury that, notwithstanding testimony had been introduced tending to impeach the witnesses in the case, the credibility of said witnesses was a question for the jury. In this there was no error. The evidence in this case, in our opinion, amply supports the verdict, and the judgment is affirmed.

*Affirmed.*