## BILL EDWARDS V. THE STATE.

### No. 831.  Decided February 22, 1911.

#### 1.—Murder—Impeaching Witness—Supporting Testimony.

Upon trial of murder, where the defendant on cross-examination sought to impeach the State's witness and lay the predicate to impeach him by other witnesses in that he had made different statements at another time, there was no error in permitting the State to support the testimony of its witness by the introduction of the testimony taken at the inquest, and this although defendant was not present.

#### 2.—Same—Evidence—Testimony Drawn out by Defendant.

Upon trial of murder, where defendant had brought out the fact on cross-examination of the State's witness that this State's witness had shown to defendant's counsel the position of the defendant and the deceased at the time of the homicide, he could not complain.

#### 3.—Same—Evidence—Impeaching Witness—Supporting Testimony.

Upon trial of murder, where the defendant on cross-examination of the State's witness had laid predicates as if he intended to offer testimony to impeach him, to show that he had made contrary statements during another trial, there was no error in permitting the State to show that the statement in writing presented to this witness was one he had made on the night of the killing in regard thereto and to permit the witness to identify his signature; the statement not being admitted in evidence as defendant offered no impeaching testimony.

#### 4.—Same—Evidence—Interrogation of Witness.

Upon trial of murder, where State's witness had denied that he had anything to do with employing counsel for prosecution, there was no error in excluding testimony which was but a repetition of matter he had denied.

#### 5.—Same—Evidence—Argument of Counsel.

Upon trial of murder, after defendant had shown by his witness that one of the State's witnesses had told defendant's witness that he did not see the first shot, there was no error in permitting the State on cross-examination to show by defendant's witness that still another State's witness had told him about the killing before talking to the first State's witness; and afterwards permitting State's counsel to argue that the witness might be mistaken as to which one of the State's witnesses told him that he did not see the first shot.

#### 6.—Same—Evidence—Defendant as a Witness—Cross-Examination.

Upon trial of murder there was no error in permitting the State's counsel in cross-examination of defendant to show his conduct from the time of the killing to the time he surrendered to the officers; and to lay a predicate to impeach him from a memorandum which he held in his hand, although this was grand jury testimony but which fact was brought out by the defendant.  Nor was there error to permit the State to show that the defendant prior to his surrender had never told anyone that he acted in self-defense.

#### 7.—Same—Evidence—Impeachment—Testimony Drawn out by Defendant.

Where, upon trial of murder, defendant had denied on the witness stand that he had told the State's witness that he had told the deceased to stay out of his pasture and that if he caught him there he would kill him, there was no error in permitting the State to ask the impeaching witness the same question as laid by a predicate from a grand jury paper; the defendant having brought out what the paper was.

#### 8.—Same—Evidence—General Reputation of Deceased.

Where, upon trial of murder, the defendant had proved by himself and several witnesses that deceased had made serious threats against the life of the defendant, some of which were communicated and others were not, there was no

error in permitting the State to prove the general reputation of the deceased for peace.

### 9.—Same—Evidence—Reputation of Deceased.

Where, upon trial of murder, the defendant was permitted to show that deceased had been indicted for aggravated assault by a judgment of conviction for simple assault, and there was no dispute about the issue that the assaulted person was an unarmed, decrepit person, there was no error not to permit further testimony on this matter.

### 10.—Same—Argument of Counsel.

Where, upon trial of murder, defendant failed to ask a special instruction to withdraw the argument of the State's counsel but the Court had virtually done so in his general charge, there was no error.

### 11.—Same—Objections to Arguments of Counsel—Practice.

Where, upon trial of murder, the record upon appeal did not show that the defendant presented any instructions requesting the court to instruct the jury to disregard State's counsel's argument, the Appellate Court cannot say that the trial court went beyond his discretion in confining counsel not to interrupt State's counsel in his argument.

### 12.—Same—Jury and Jury Law—Remarks by Judge.

Where, upon trial of murder, it was not shown by the record on appeal that the appellant suffered any injury by the remarks of the judge to the venire before any part of the jury was impaneled, there was no error.

### 13.—Same—Charge of Court—Self-Defense—Theory of Defense.

Where, upon trial of murder, the State's theory was that the deceased was unarmed and was shot in the back by the defendant, and the defendant's theory was that he acted in self-defense, and the court submitted both theories properly and also the requested special instructions on behalf of the defendant, there was no error.

### 14.—Same—Charge of Court—Murder in the Second Degree—Implied Malice.

Where, upon trial of murder, the evidence raised the issue of murder in the second degree, and the court properly submitted the law of implied malice in his charge on murder in the second degree, there was no error.

### 15.—Same—Charge of Court—Manslaughter.

Where, upon trial of murder, the court properly submitted the law of manslaughter, both in regard to insulting language to a female relative and from the standpoint of passion, etc., there was no error.

### 16.—Same—Charge of Court—Threats.

Where upon trial of murder, there was evidence of both communicated and uncommunicated threats and the court properly instructed the jury as to the effect of each, there was no error.

### 17.—Same—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence sustained a conviction of murder in the second degree, there was no error.

Appeal from the District Court of Eastland. Tried before the Hon. Thos. L. Blanton.

Appeal from a conviction of murder in the second degree; penalty, thirty-six years imprisonment in the penitentiary.

The opinion states the case.

*Cunningham & Oliver* and *Otis Bowyer* and *Hardwicke & Hardwicke,* for appellant.—Upon question of admitting testimony of State's

witness Russom with reference to the alleged position of defendant at the time the first shot was fired: Doucette v. State, 45 S. W. Rep., 800.

On question of admitting testimony of State's witness Taylor before inquest: Green v. State, 49 Texas Crim. Rep., 238, 90 S. W. Rep., 1115; Reese v. State, 43 Texas Crim. Rep., 539, 67 S. W. Rep., 325; Doucette v. State, supra; Redd v. State, 39 Texas Crim. Rep., 414, 46 S. W. Rep.; 408.

On question of admitting testimony of character of deceased: Arnwine v. State, 50 Texas Crim. Rep., 254.

On question of not permitting defendant's counsel to cross-examine State's witness to show that deceased had been tried for aggravated assault: Howard v. State, 37 Texas Crim. Rep., 494; Stull v. State, 47 Texas Crim. Rep., 547, 84 S. W. Rep., 1059.

On question of permitting State to use grand jury testimony in impeachment: Bashford v. People, 24 Mich., 244.

Upon question of remarks by judge: Moore v. State, 33 Texas Crim. Rep., 306; Simmons v. State, 55 Texas Crim. Rep., 441.

Upon question of court's preliminary remarks to the venire: Gulf, C. & S. F. Ry. Co. v. Johnson, 99 Texas, 337, 90 S. W. Rep., 164.

On the question of the court's charge on manslaughter: Akin v. State, 56 Texas Crim. Rep., 324, 119 S. W. Rep., 863; Tucker v. State, 50 S. W. Rep., 711; Williams v. State, 25 Texas Crim. App., 216; Gilcrease v. State, 33 Texas Crim. Rep., 619; Woodward v. State, 50 Texas Crim. Rep., 294, 97 S. W. Rep., 499; Clark v. State, 51 Texas Crim. Rep., 519, 102 S. W. Rep., 1136; Schaner v. State, 60 S. W. Rep., 249; Rice v. State, 51 Texas Crim. Rep., 255; Snowberger v. State, 58 Texas Crim. Rep., 530, 126 S. W. Rep., 883.

On question of court's charge on threats: Lundy v. State, 127 S. W. Rep., 1035; Mitchell v. State, 55 Texas Crim. Rep., 62; Buckner v. State, 55 Texas Crim. Rep., 511; Huddleston v. State, 54 Texas Crim. Rep., 93; Lockhart v. State, 53 Texas Crim. Rep., 589; Cohen v. State, id., 422; Bonner v. State, 29 Texas Crim. App., 223; Pratt v. State, 50 Texas Crim. Rep., 227; Fisher v. State, 50 Texas Crim. Rep., 471; Watson v. State, id., 171; St. Clair v. State, 49 Texas Crim. Rep., 479.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—The appellant was indicted in the District Court of Callahan County, charged with murder. The venue was changed to Eastland County, and upon a trial he was convicted of murder in the second degree.

1. The first witness for the State was Wash Russom. Russom testified that on the evening of the killing he saw defendant hauling poles to put up a fence on land about which defendant and deceased had been quarreling. That after defendant had passed by his house

with the second load of poles deceased came to him at his barn and asked if defendant was unloading the poles down there. That deceased had on no coat and was dressed in blue overalls. That he leaned up against the fence, and witness commenced to unharness his horses, and while he was doing so, that he heard defendant's wagon coming down the road. Upon looking up he saw defendant reach down in his wagon and get his gun and fire at deceased. That not a word was spoken between deceased and defendant, and when defendant fired the first shot deceased started away from him, when defendant fired the second shot and deceased fell. That deceased was shot in the back of the head and died instantly, being shot with buckshot. Defendant cross-examined the witness, and laid predicates to impeach him by Keyworth, Reynolds, Hampton and others, and by the introduction of a portion of his testimony given at the trial in Callahan County, showing that he had made statements different to his testimony on this trial. The night of the day Rogers was killed an inquest was held, and this witness testified at the inquest, and when defendant had offered the impeaching testimony the State was permitted to support this witness by the introduction of the testimony taken at the inquest and sworn to by the witness.

Appellant reserved a bill of exception to the introduction of this testimony on the ground that he was not present when the witness testified at the inquest. It has always been the rule in this State that when a party seeks to impeach a witness by contradictory statements, and by proof of different testimony at another trial, the party offering the witness may support him by showing that he had made the same statement on other and different occasions. The inquest testimony was reduced to writing the night of the killing, and this statement of the witness, being the first he had made, was admissible to support him. In Sims v. State, 36 Texas Crim. Rep., 154, the court says: "Appellant complains that the court erred in allowing the State to read, as a part of its rebutting evidence, excerpts from the testimony of Peter Barnes, taken by deposition upon the inquest trial, and upon the examining trial in this case. In our opinion this testimony was admissible. As we understand it, it was shown by defendant that Peter Barnes had made statements with reference to how the killing occurred, in conflict with the testimony delivered by him on the stand at the trial; and it was competent to show that he had made the same statements, or statements similar in substance to those made by him at the trial shortly after the occurrence. In our opinion it makes no difference whether these statements were made under oath in the previous examinations of the witness, or to persons on the outside. The rule in this respect is the same." See also Bozeman v. State, 34 Texas Crim. Rep., 503; Williams v. State, 24 Texas Crim. App., 637; Dicker v. State, 32 S. W. Rep., 541; Keith v. State, 38 Texas Crim. Rep., 678, 44 S. W. Rep., 849; Scott v. State, 47 S. W. Rep., 531.

Appellant also complains that this witness was permitted to testify

that he had shown to defendant's counsel the position of defendant and the deceased at the time of the fatal shooting. Defendant elicited this testimony first on cross-examination of the witness by presenting to him some photographs of the scene of the killing, and by questioning him if the photographs were not correct, and if he had not shown them where to place the camera, as the point where defendant stood at the time of the killing, and also showing them the point on the fence where deceased stood, and if the automobile driver had not been placed at that point. Defendant also introduced the artist who took the photographs, and who testified this witness showed them the position of defendant and deceased. Having drawn this testimony from the witness, and introduced other testimony that he did do so, the defendant can not complain of its admissibility, or the fact that State's counsel questioned the witness in regard to it, and commented on it in their argument. In Speights v. State, 1 Texas Crim. App., 551, the court holds: "As to this last ground of objection, we conceive the defendant can not be heard to complain, because this testimony, as we have seen, was drawn out at his own instance, on cross-examination of the witness, and in response to his own questions. The testimony, if illegal at all, was his own testimony, and we opine he ought to be held to take the consequences, and could not exclude it simply because it was found to be unfavorable to his case." Noftsinger v. State, 7 Texas Crim. App., 301; 1 Greenl. on Ev., secs. 448, 449.

2. Appellant also complains that · the court permitted the State, while its witness Louis Taylor was on the stand, to prove by said witness that the statement in writing presented to him was a statement in regard to the killing made by him on the night of the killing, and to identify his signature to same. In the cross-examination of this witness defendant had laid predicates as if they intended to offer testimony to impeach him, and as said by the judge trying the cause, "the defendant had brought out the fact that at the time the inquest was held this witness was present; had brought out the fact that Judge McCammon and the district attorney arrived at the scene of the homicide several hours after the killing, and had put the witness through a very severe cross-examination in an attempt to show that he had made contrary statements in the trial at Baird; that he had testified before the grand jury, and had made statements different from his testimony at the trial. They had also tried to discredit him by attempting to prove that he had carried witnesses out there to make measurements to fit his testimony, and by questions as to his interest in the case and motive for testifying." The defendant sought to create the impression that the witness was testifying falsely because of a statement in regard to property said to have been made to him by a brother of deceased. In the case of Riojas v. State, 36 Texas Crim. Rep., 182, Judge Hurt lays down the rule: "When a witness is charged with giving his testimony under the influence of some motive prompting him to make a. false or colored statement, it may be shown that he made similar

declarations at a time when the motive did not exist. So, in contradiction of evidence tending to show that the account of the transaction given by the witness, is a fabrication of late date, it may be shown that the same account was given by him before its ultimate effect and operation could have been foreseen." Under this rule laid down by the learned judge, the testimony of this witness taken at the inquest would have been admissible in evidence to support his testimony, for the defense not only laid predicates by which to impeach him, but also pursued a line of investigation the tendency of which could only have the effect that witness was testifying from an impure motive, and that the witness had not in fact seen the killing, and his testimony was wholly manufactured. But when the defendant did not follow up the predicates by offering impeaching testimony, the statement was not admitted in evidence. After laying predicates to impeach him, and seeking to make the impression that he was testifying from mercenary motives, the defendant can not complain that the State proved he had made a statement immediately after the killing, and have him identify the statement, under the evidence in this case. See also White v. State, 42 Texas Crim. Rep., 567, 62 S. W. Rep., 575, and authorities there cited.

3. Appellant also complains that the court sustained an objection to the following question propounded to the witness: "Is it not a fact that when Rogers' brother came down here from Ohio he proposed to you and your wife and Mrs. Rogers that if you all would arrange a fee for the prosecution that he would assert no claim as an heir to his brother George A. Rogers (deceased) to the property out here in Callahan County?" The judge in approving the bill states (and the statement of facts bears it out): "The witness had testified that he was not assisting in the prosecution; had nothing to do with it; that he married a daughter of Mrs. Rogers, and deceased was his stepfather-in-law. That he went with the brother who came from Ohio to see W. J. Cunningham about employing him to prosecute this case. That he was employed, and that Mrs. Rogers and his wife had signed the note and secured the fee. That he knew nothing about the property; that it was nothing to him, and he knew nothing about the business matters." It seems that the witness had fully answered the question, and it was not error on the part of the court not to permit a repetition of the same matter.

4. The appellant also reserved a bill of exception, that after the defendant had proven by the witness Keyworth that State's witness Russom had told him he did not see the first shot, the State in cross-examination was permitted to show by the witness that witness Taylor had told him about the killing, before talking with Russom. Russom claimed on the trial to have seen both shots, while Taylor testified that he did not see the first shot. We think the testimony was admissible, and it was permissible for counsel for the State to have argued that the

witness might be mistaken as to which one told him they did not see the first shot.

5. Appellant also objected to the State asking defendant about his conduct from the time of the killing to the time he surrendered to the officers. No question was asked about anything after his arrest, but questions were asked about him passing the dead man in the road; about the time he arrived at home; how long he stayed there; who, if any one, he told about the killing, and the way he went to the county seat, and who, if any one, he saw on the road. Defendant also objected, while the State was cross-examining the defendant, to permitting the State to ask questions and lay predicates from a paper held in the hand of State's counsel. In qualifying this bill the court says: "So far as the jury knew, State's counsel merely had a memorandum in his hand, and the defendant brought out the fact that it was grand-jury testimony, and several times accentuated this before and in the presence of the jury. It was at the instance of defendant's counsel that the court had the State submit said paper to them for inspection." When a party accepts a bill qualified by the court, he is bound by the qualification. Jones v. State, 33 Texas Crim. Rep., 7; Hardy v. State, 31 Texas Crim. Rep., 289; Levine v. State, 35 Texas Crim. Rep., 647. And it is held in Blain v. State, 34 Texas Crim. Rep., 448, in order to have revised on appeal the action of the trial court in modifying, changing, qualifying or contradicting a defendant's bill of exceptions, the defendant must have objected to such action at the time, and have reserved a bill of exception to such alterations of his original bill. A failure to do so is tantamount to an acceptance of the altered bill, and estops defendant from further complaint in the matter." That State's counsel had a right to lay a predicate from memorandum in his hands, and if the fact that it was grand-jury testimony was brought out by appellant, he can not be heard to complain. A defendant who takes the witness-stand in his own behalf assumes the character of a witness, and is subject to the same treatment as any other witness. If he puts himself on the stand in his own behalf, he renders himself liable to be cross-examined upon all the facts relevant and material to the case, and can not refuse to testify to any facts which would be competent evidence in the case if proved by other witnesses. Quintana v. State, 29 Texas Crim. App., 401; Thomas v. State, 33 Texas Crim. Rep., 607; Morales v. State, 36 Texas Crim. Rep., 234.

Appellant testified that he shot deceased in self-defense; that from the acts and conduct of deceased he believed his life was in danger. Any witness on behalf of defendant, who had testified to conduct rendering the defendant justifiable, would be subject, on cross-examination, to examination about when he first told the facts, and if when he was testifying was not the first time he had ever made such a statement. It was permissible on the part of the State to show that defendant, prior to his surrender and prior to his trial, had never told

any one that he acted in self-defense, and that, opportunity offering, he had not told his brother.

6. Appellant also complains that in examining the witness Ward, the State, having laid the predicate from the paper while defendant was on the stand, asked the witness Ward leading questions. As before stated,. the defendant having brought out what the paper was, can not complain, and it was proper to ask the questions of the witness Ward just as the predicates were laid. Defendant also complains that the question asked the witness Ketchens was leading. The question was: "About two years before G. A. Rogers was killed, did you have a conversation with defendant in his pasture in which he told you he had told Rogers to stay out of his pasture, and if he caught him in there again he would kill him?" To which the witness answered: "Bill Edwards told me that he told Rogers to stay out of his pasture; that if he caught him in there he would kill him." This predicate had been laid first in this form while defendant was on the stand; he had denied making the statement, and it was proper to ask the question just as defendant had been interrogated.

7. Appellant complains that the court erred in permitting the State to prove the general reputation of deceased in the community where he lived as being a peaceable, law-abiding citizen. The defendant had proven by several witnesses that deceased had made serious threats and had threatened the life of defendant. While it was not shown that any of these witnesses communicated these threats to defendant before the killing, several witnesses testified that Rogers had told them of threats he had made to defendant direct, and defendant himself testified to a threat to kill him, the language being as follows: "He (deceased) told me: 'I see you cut out that fence row; what did you do it for?' I told him I was going to put up my fence. He says: 'Don't let me catch you on that fence row; if I do I will kill you.' " This is a threat directly testified to by defendant, and rendered the reputation of deceased as a peaceable, law-abiding citizen admissible. Article 713 of the Penal Code provides: "In every instance where proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased." Under this article of the Code, and the testimony of the defendant, we think this testimony admissible.

8. The court permitted the defendant to show by county officials that deceased had been indicted for making an aggravated assault; the information was introduced and the judgment of conviction for simple assault. A county official was permitted to state that the person he assaulted was a one-armed, decrepit person. No one disputed this evidence. After this had been proven, it was not error for the court to decline to permit other testimony as to this same transaction. If it had been a contested issue, it might have been improper for the court to do so.

9. Complaint is made of the argument of counsel· for the State.

Defendant did not request any instructions, yet the court in his charge told the jury: "If in his argument any attorney for the State has represented the law to be different from that given you by the court, or has misstated the evidence in any way not supported by the record .in this case, then in such event you will not consider such portion of such argument." In Renfro v. State, 42 Texas Crim. Rep., 393, 56 S. W. Rep., 1013, the court says: "Defendant complains of the argument of State's counsel. The objection can not be considered because no special requested instruction was asked by appellant," citing Monticue v. State, 40 Texas Crim. Rep., 528, 51 S. W. Rep., 236; Levine v. State, 35 Texas Crim. Rep., 647; Wright v. State, 37 Texas Crim. Rep., 146.

10. Defendant also complains of the action of the court in the following particulars: "After the argument had all been made except the closing argument of the district attorney, the following proceedings occurred just before the district attorney begun the closing argument of the case:

"Mr. Hardwicke (of counsel for defendant): 'I understand your holding is that objections to the argument of the prosecuting attorney can not be made in open court, but must be made to you privately.'

"The Court: 'I will permit you to make them, provided you do not interrupt counsel; you can make them in open court if you will do so without interrupting counsel's argument.'

"Mr. Hardwicke: 'I can not rise in court and in presence of the jury and make objections so they can understand the meaning of my objections?'

"The Court: 'No, sir.'" The court stated if objection was made to him, and he considered the argument objectionable, he would so instruct the jury, and all defendant needed to do was to indicate the argument he excepted to without assigning the reasons.

We have set this bill out rather fully, because we deem it proper that counsel for defendant should always be given proper opportunity to make any objection he desires, and reserve his bill of exceptions. Of course, should counsel make use of an objection to seek to make an argument to the jury, it is proper that the court should not permit it, and we can not say that when the court told counsel he would permit him to make any objection he desired in open court, but would not permit him to assign reasons *so that the jury could understand his objections,* that the court stepped beyond the line of the discretion confided to him. The objection should be made so that the judge trying the case can intelligently rule, and the jury has no function in the matter until the court decides whether it is proper or improper. The objection is addressed to the court and not to the jury, and if counsel, by means of offering objections, was seeking to address the jury, the court did not err in not permitting it. As this record presents the matter, and as the counsel did not present any instructions requesting the court to instruct the jury to disregard any portion of the argument, we can not see that defendant suffered any injury. Otherwise

the able and alert counsel would have made a request requesting the court to instruct the jury to ignore it.

11. Defendant also complains of the action of the court in making certain remarks to the venire before any part of the jury was impaneled. We have carefully read the remarks as quoted by counsel, and the remarks in full as set out by the court, in passing on the bill, and we fail to see in what respect such remarks were injurious. It might be the better practice for the court to merely ask the statutory questions, but if a trial court sees proper to make remarks, some injury must be shown that defendant suffered, otherwise this court will not consider the matter. In the light of all the remarks, as set out by the court, we would be of the opinion that same were not hurtful to appellant.

Defendant made no motion to set aside the venire. He proceeded to select a jury, and makes no complaint about the members of the jury selected. He does not show that the remarks affected any of them in any manner. In the absence of injury being shown, when defendant voluntarily proceeded to select a jury from the venire, we would not disturb a verdict because of such remarks.

12. Defendant also complains of several paragraphs of the court's charge. The facts, in substance, are about as follows: Defendant and deceased had been unfriendly a number of years; in fact, defendant testified that he had never liked deceased. Defendant had a strip of land fenced that deceased claimed, and had had it fenced for more than ten years. Deceased, claiming to believe that defendant was holding this strip under the statute of limitation, took possession of a wedge-shaped piece of land of defendant, adjoining his place. Several wordy altercations took place. During the winter before the killing defendant told deceased he was going to fence this wedge; deceased insisted he would not permit him to do so. Defendant told him he was going to fence, and says, "When I start I will 'holler' to let you know." Defendant took his Winchester and went down to begin work cutting out the fence row, and "hollered" several times to let deceased know he was at work preparatory to fencing the land. Deceased did not go down, but on account of sickness defendant was prevented from fencing the land at this time. If the record is to be believed, deceased made threats to take the life of defendant, and defendant made threats to take the life of deceased. Some time before the killing defendant's wife gave birth to a baby. This was the only child they had. Defendant's wife died. Deceased made remarks that this was not the baby of defendant's wife, but a baby that defendant had obtained to hold certain property at the death of his wife. They met six weeks before the date of the killing. On this occasion deceased had cursed defendant, said the baby was a bastard, and called defendant a "s—n of a b—h;" defendant also cursed deceased, and called him a "G—d d—n blue-bellied, c—k-s—king, mother-f—king s—n of a· b—h." It appears that they were bitter in their remarks. Defendant says deceased

was armed, but made no effort to kill him. That he, after this bitter tirade of words, rode off. That deceased had told him prior to that time that if he undertook to fence the wedge-shaped piece of land he would kill him. Defendant and deceased, after this quarrel, did not meet until the day of the killing. On this day defendant loaded his wagon with poles and a shotgun, and hauled these poles and unloaded them on the disputed ground. After unloading the second load, in driving out of a lane near Russom's barn, defendant says when he got close enough to recognize deceased that deceased started towards him, saying, "Bill Edwards, you G—d d—m s—n of a b—h, you have robbed a man of his bastard baby, but you can't rob me of this piece of land." "His right hand was in the bib of his overalls. He seemed to be moving his hands like he was trying to get something. I then picked up my gun and shot him." This was defendant's theory, and it presented, if believed, a justification, and defendant was entitled to have this theory presented to the jury. The court did this from the standpoint of real danger and apparent danger in his main charge, saying:

"If, from the evidence, you believe that the defendant killed the said G. A. Rodgers, but you should further believe that at the time of so doing the deceased, on meeting the defendant, made any act or demonstration evidencing an apparent intention of drawing a pistol for the apparent purpose of taking the life of the defendant, or inflicting upon him some serious bodily injury, or if it then reasonably appeared to defendant, judged from his standpoint at the time, that the deceased was making an attempt to draw a pistol, even though you should believe in fact said deceased had no pistol, and the defendant then reasonably believed that he was then about to suffer death or some serious bodily injury at the hands of the deceased, and that acting under such reasonable apprehension of danger the defendant shot and killed the deceased; or should you believe from the evidence that, prior to the homicide, the deceased made a threat or threats to take the life of the defendant or to inflict upon him some serious bodily injury, and if, prior to the homicide, defendant knew of such threats, if any made by deceased, either to himself or to others, and if at the time of said homicide the deceased, by any act, words or demonstration, manifested an intention to execute such threat, or it then so reasonably appeared to the defendant from his standpoint at the time, and the defendant then reasonably believed that the deceased was then about to carry out or to put into execution such threat, if any, and that he then believed that he was in danger of losing his life or of suffering serious bodily injury at the hands of the deceased, and that, acting under such reasonable apprehension of danger the defendant shot and killed the deceased, then in either of such events the defendant would be justified in his actions, and it would be your duty, should you so believe, to acquit the defendant and say by your verdict, not guilty."

Defendant requested two special instructions on this phase of the case, both of which were given by the court, and defendant can not complain that his theory of the killing was not presented in as favorable light as the evidence justified.

The State's theory of the scene of the killing was testified to by Russom and Taylor. There were but three eyewitnesses to the tragedy —defendant and these two witnesses for the State. They testify, in substance, that deceased was unarmed, and was shot in the back of the head, the shot coming out at his mouth. That deceased was walking away from defendant when he was killed. Russom says deceased was standing by a post of his barn lot when defendant drove up; that not a word was spoken by either party, but defendant, upon seeing deceased, reached down in his wagon, got his gun and fired; that deceased started away from defendant, when the second shot was fired, which shot killed him; that deceased made no demonstration of any character, but that defendant shot him on sight at a time when he was walking away from him.

13. The court presented in his charge both degrees of murder, and manslaughter. No complaint is made of his charge on murder in the first degree, but complaint is made of the definition of murder in the second degree. The court defined murder of the second degree thus: "Malice is also a necessary ingredient of the offense of murder of the second degree. The distinguishing feature, however, so far as the element of malice is concerned, is that in murder in the first degree malice must be proven to the satisfaction of the jury beyond a reasonable doubt as an existing fact, while in murder in the second degree malice will be implied from the fact of an unlawful killing, where the facts and circumstances do not reduce an unlawful killing to the grade of manslaughter.

"Implied malice is that which the law infers from or imputes to certain acts, however suddenly done. Thus, when the fact of an unlawful killing is established, and there are no facts or circumstances in evidence which establish the existence of express malice, and none which tend to reduce the killing to manslaughter, and none which tend to excuse or justify the killing, then the law implies malice." This definition is in accordance with the decisions of this court. Martinez v. State, 30 Texas Crim. App., 129; Stanley v. State, 16 Texas Crim. App., 392; Hart v. State, 21 Texas Crim. App., 163; Baltrip v. State, 30 Texas Crim. App., 545; Patterson v. State, 60 S. W. Rep., 557.

14. Defendant also complains of the court's charge on manslaughter. The court submitted manslaughter from two view-points: First, insulting language in regard to a female relative, the baby being a girl. This was fully and fairly presented, and the jury is told that if deceased used insulting language in regard to the female relatives of defendant, and defendant killed him under the immediate influence of sudden passion arising from or produced by such adequate cause, and was not justified in so doing under the law of self-defense, the de-

fendant would not be guilty of any higher grade of offense than man-slaughter. The court also presented manslaughter from the stand-point of passion, etc., by the language, acts and conduct of deceased, and the charge is not subject to the criticism of counsel for appellant. The entire paragraph should be looked to, and not one sentence, and complaint is made that the court told the jury "that the passion is not the result of former provocation." Immediately following this sentence the court tell the jury: "But in determining this question the jury may consider former provocations of the deceased, if any, in connection with the provocation of the deceased at the time of the killing in order to determine the state of the defendant's mind at the time of the killing." As a whole, the charge presents the issue as applicable to the evidence in this case.

15. Complaint is also made of the court's charge on threats. As there was evidence of both communicated and uncommunicated threats, the court instructed the jury as to the effect of each, his charge being: "If the deceased, prior to the homicide, made any threat or threats against the defendant, which were not communicated to defendant and of which the defendant had no knowledge at the time of the homicide, then you can not consider such uncommunicated threats in justification of defendant's act, but such communicated threats, if any, may be considered by you for the purpose of explaining the acts, if any, of the deceased at the time of the difficulty, and to ascertain whether or not the deceased commenced the difficulty at the time of the homicide or made the first hostile act or demonstration at that time.

"If, prior to the homicide, the deceased made any threat or threats against the defendant to take his life or to inflict upon him some serious bodily harm, and such threats were communicated to the defendant prior to the homicide, and at the time of the homicide the deceased by any act or demonstration, or by any words accompanying or connected with such acts or demonstrations, if any, manifested an intention to execute such threat, or if it then so reasonably appeared to defendant, then the defendant would be authorized to act upon the appearances in resorting to any means to protect himself."

These charges, we think, are in accordance with the decisions of this court. Trotter v. State, 37 Texas Crim. Rep., 468; Levy v. State, 28 Texas Crim. App., 203; Irwin v. State, 43 Texas, 236; Dawson v. State, 33 Texas, 492; Hoover v. State, 35 Texas Crim. Rep., 342.

After careful review of this case and all the assignments of error, we have come to the conclusion that there is no error shown that would authorize a reversal of the judgment. There was a sharp conflict in the testimony. The State's evidence makes a case of murder; the defendant's testimony would make a case of justifiable homicide. This theory was presented by the court very favorably to the appellant. Appellant has been represented by able counsel, and they have presented his case in as strong a light as possible, but the juries have twice found against his contention, and taking the way this case was

tried, with the numerous questions raised, we do not think appellant has any just cause to complain. The judgment is affirmed.

*Affirmed.*