Tom Collins v. The State.

No. 1807.    Decided May 29, 1912.

Rehearing denied June 26, 1912.

**1.—Assault to Rape—Sufficiency of the Evidence.**

Where, upon trial of assault with intent to commit rape, the evidence sustained the conviction, there was no error.

**2.—Same—Continuance—Want of Diligence—Impeaching Testimony.**

Where defendant's application for continuance showed a want of diligence, and the absent testimony was of an impeaching character there was no error in overruling the same.

**3.—Same—Misconduct of Jury—Impeaching Verdict.**

Where, upon trial of assault to rape, some of the jurors sought to impeach their verdict, because they had acted on the suggestion that it was not necessary for defendant to have the specific intent to rape, but the court's charge properly submitted this question, and also aggravated assault, there was no error;

besides jurors will not be permitted to impeach their verdict by testifying that they misunderstood the charge of the court.

**4.—Same—Evidence—Supporting Testimony.**

Where, upon trial of assault to rape, the defendant sought to impeach the testimony of prosecutrix, there was no error in permitting the State to show that she had made the same statement before trial.

**5.—Same—Evidence—Bill of Exceptions.**

Where, upon appeal from a conviction of assault to rape, the bill of exceptions failed to show what answer the defendant made to the question propounded to him by the State, the matter could not be reviewed.

**6.—Same—Argument of Counsel.**

Where, upon trial of assault to rape, the record showed that the argument of State's counsel was in reply to remarks of defendant's counsel, there was no error.

**7.—Same—Charge of Court—Force—Female under Age of Consent.**

Upon trial of assault with intent to rape, where the evidence showed that the alleged female was under age of consent at the time of the assault, there was no error in refusing a requested charge in regard to the amount of force necessary to establish the specific intent to rape.

**8.—Same—Argument of Counsel.**

Where the court instructed the jury not to consider the remarks of State's counsel, and there was no charge requested to withdraw the same and they were not of such character as would present reversible error, there was no error.

**9.—Same—Charge of Court—Assault.**

Where the court required the jury to find beyond a reasonable doubt certain facts to be true, which in law would amount to an assault—upon trial of assault to rape upon a female under the age of consent—before they could convict, it was immaterial whether the court gave the definition of assault.

Appeal from the District Court of Burleson. Tried below before the Hon. Ed. R. Sinks.

Appeal from a conviction of assault with intent to rape; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Buchanan* and *Stone* and *T. J. Carter,* for appellant.—On question of specific intent to rape: Cromeans v. State, 129 S. W. Rep., 1129; Blair v. State, 132 S. W. Rep., 358; Alexander v. State, 127 S. W. Rep., 190; Carter v. State, 44 Texas Crim. Rep., 312; Croomes v. State, 40 id., 683; Hudson v. State, 49 id., 24; Cotton v. State, 52 id., 55.

On question of misconduct of jury: Tuller v. State, 58 Texas Crim. Rep., 572; Battles v. State, 53 id., 202; Vanduran v. State, 50 id., 440; Hargrove v. State, 51 id., 47; Hall v. State, 52 id., 250.

On question of continuance: Edmonson v. State, 36 S. W. Rep., 271; Foster v. State, 105 S. W. Rep., 498; Ball v. State, 72 S. W. Rep., 384; Yantis v. State, 94 S. W. Rep., 1021.

Upon question of cross-examination of defendant: Nicks v. State, 46 Texas Crim. Rep., 257.

*C. E. Lane,* Assistant Attorney-General, for the State.—Cited cases in opinion.

HARPER, JUDGE.—Appellant was indicted, charged with the offense of assault with intent to commit rape; when tried he was adjudged guilty and his punishment assessed at two years in the penitentiary.

The first two grounds in the motion for new trial complain of the verdict, alleging that the evidence is insufficient to show that appellant assaulted the prosecuting witness, or that if he did assault her, it was with the intent to commit the offense of rape. The prosecuting witness, Iva May Griffin, testified she went with appellant and his sister to a party at Mr. Kaltwasser's on the night of the alleged offense. That when returning home she requested appellant to carry her home, but appellant insisted on carrying his sister home first, and did do so, and then started with her to her home, when, she says, they got to a gap they must pass through, and appellant stopped, and then to tell it just as it appears in the statement of facts, we copy: "I asked him what he stopped for, and he said it was none of my damn business, he says, he done as he damn please wherever he went, and I says— 'Get out and open the gate, it is late, mamma is expecting me back home,' and he said he wouldn't do it and I couldn't make him, and I told him I would get out and open the gate, and then he got out and opened the gate and came back and got in the buggy and says, 'Now you drive through,' and then he got out and went back and closed it again; yes, sir, he did something else. Well, he mentioned trying to get me to leave here with him, asked me if I would run off with him, and I says, 'No, I never saw the man yet that I would run off and marry,' and he says to me, 'Yes, and I never saw the damn woman yet that I would marry,' and as I commenced to crying, and he says that I could go to a boarding house with him, and when I got ready I could come back; he wanted me to go to Temple with him and stay at a boarding house with him, and he says, any time I got ready to go that I could go back in the name of Miss Iva May Griffin, and that I would be just as nice then as I ever was, and then he said if I would do what he wanted to he would pay me—said he would pay me just as much as I wanted if I would do what he wanted me to do, and I said I would not do any such thing, and he says, if I won't do it for pay, I would do it anyhow; he said I had to give him what he wanted; he said that 'pussy is what he wanted, and he was going to have it;' no, sir, he didn't do anything to me; he tried to hold me in the buggy, and I started to get out of the buggy, and as I did he cut one wheel of the buggy out of the road and one was in it, and he turned the horse's head right in the corner of our pasture, right there where our land and Mr. Allcorn's land comes together, he cut my wheel around so that I couldn't get out, the wheel on my side; I said if he didn't leave me alone I was going to tell papa on him, and he said, 'he didn't give a God damn for my daddy and brother both—I don't give a damn.

I am ready for them any time, I am fixed for them any time;' yes, sir, I got out of the buggy; no, sir, he never did get hold of me outside of the buggy. As to what he did to me inside of the buggy, will say, he tried to hold me in the buggy, and I jumped out of the buggy and I went to the wire, and I said I would call mamma, and I would go home—go right through the pasture, and as I was fixing to crawl under the wire he jumped out, and then I went around the buggy, and he went around the horse's head that way (indicating) and I got back in the buggy and he got back in the buggy and he caught hold of me again; he caught hold of me around the waist; he didn't try to put his hands anywhere, he tried to pull up my dress—he tried to pull up my dress so many times—so many times that I can't remember; the reason he didn't pull it up was because I fought him just as long as I could; yes, sir, somebody came along during that time; during this time I was crying, and trying to get him not to bother me, told him I would call papa; I was crying and trying to get aloose, and he said, 'Crying won't do any good;' yes, sir, I screamed; the expression I used was, 'Oh, Lordy, what shall I do?' I cried out lots of times, I don't know how many times; yes, sir, I was badly frightened. Yes, sir, I saw some one coming along; Mrs. Allcorn came along; I was in the buggy at the time she came along, I just had got in the buggy when she came along, he was standing on the side. As to whether Mrs. Allcorn said anything to him, or he said anything to Mrs. Allcorn, will say, he says, 'Mrs. Allcorn do you want to go through this gap?'—as soon as he saw her he says—he says—'Mrs. Allcorn do you want to go through here?' and she said, 'Yes,' and he got out and opened the gate there and I drove through; yes, sir, Mrs. Allcorn went through the gate; no, sir, she didn't say anything at the time; no, sir, I didn't say anything to Mrs. Allcorn. As to why I didn't say anything to her, will say, well, I was scared so bad I didn't think of it, I didn't know what to do. As to what happened after that, will say, he drove on till he got on the other side of Mrs. Allcorn, and he commenced again, between Mrs. Allcorn and the ravine; yes, sir, we had passed Mrs. Allcorn at that time—it was about one hundred yards, I guess, on the other side of .the gulley, towards Mrs. Allcorn's house, on the side towards Mrs. Allcorn's house; no, sir, I don't know how far it was from Mrs. Allcorn's house; and he commenced holding me again, tried to hold me again, and I got out of the buggy and I told him I was going through the pasture and go home, and he said, 'he didn't give a damn,' and he turned his horse around on this side of the road and came back on this side of the road, and he says, 'Come get in the buggy, I ain't going to bother you any more, I'll leave you alone,' and if I had went through there I would have went through a deep gulley, and I got in the buggy again, and when he got to the gulley he turned down it, down that way, and I turned around and pulled the horse back in the road, and after we got through that gap, through that cut, and when we got to the gate there, about hundred yards from

the cut to the side of the gate, from our house, he commenced again, and I tried to get out, and he pulled his horse right up against the wire, and he caught hold of me again, and I couldn't get away from him that time, the only way I could get away from him was to drop my handkerchief, and I told him he had to turn me 'loose, I had to get my handkerchief, and he said, 'he didn't give a damn, that wasn't no kind of a handkerchief,' and I says, 'Let me aloose,' and I grabbed the buggy whip and hit him over the head, and then he had to get out, I knocked his hat off, and he had to get out to get it, and I started on then, was going home; I was going to leave him, and then he ran around side of the buggy and caught hold of the lines and jerked the horse's head right up just as hard as he could, and it scared me so, the horse rared up, and I jumped out of the buggy and was going to the house by myself, and he said, 'If I would wait and get in the buggy again he wouldn't do anything more to me,' and I told him, 'No, I didn't want anything more to do with him,' and he says, 'He didn't give a damn whether I got in or not,' and then he says, 'He was damn tired of fooling with me, and he was going to do what he damn pleased,' and he caught hold of my arm, and he told me to get in the buggy and he would take me home, and he wouldn't bother me any more, and I says, 'You done told me that lie once,' and he says, 'If you will get in the buggy I won't bother you any more,' and I got in and went on home, and he says, 'Now don't you tell,' and he says, 'If you do it won't be good for you'—he said that when I told him I was going to tell papa; when I got home I jumped out of the buggy and ran on in the house."

Mrs. Mattie Allcorn, whom the prosecuting witness says passed along while they were at the gap, testified: "As to what happened on the way back to my house, will say, well, as I got a piece from the house, I reckon maybe 200 steps or so, I think it was about that far, best that I can get at it, that far from the Wilkerson house, I heard some loud talking, and I thought it was my two daughters, and it excited me—heard the loud talking, and I knew that it was some one in distress from the loud talking; and I told my little boy to wait a minute and in a minute I heard it again, some one talking—heard it plainer, and broke and run; as to what direction I ran, will say, you know the road through the field, don't you, I ran down to where it turned the last time before we got to the wire gap; that wire gap is right between our field and Mr. Wilkerson; that gap maybe is about 400 yards from the Wilkerson house, I mean it is about that far straight through, best that I can judge; it is a little further along the road; yes, sir, I broke to run, still was in this wagon road, I didn't go through the prairie on account of the grass burrs, and the next I heard some one crying, crying like they was in distress, still I thought it was my girls, and I ran on and I stopped then at the gate, I was so tired, and I have trouble with my heart anyhow; no, sir, the gate I am speaking about is not the wire gap, it is the gate that goes into the Wilkerson pasture,

before you get to the wire gap; I ran again then just as hard as I could, and I stopped, and I heard some one say, 'Oh, Lordy, what will I do,' and I run again as hard as I could, and before I got to this wire gap, thinking it was my daughters, I screamed as loud as I could, called my oldest daughter's name and told her I was coming; my daughter's name was Lula; yes, sir, I thought it was my girls, and I screamed, I thought something had scared them, and I went on down to the wire gap and I found it wasn't my girls, but that it was some one else; it was Iva May Griffin and Tom Collins; Tom Collins is the defendant; Iva May was sitting up in the buggy and he was standing down by the side, and I just stood there and he opened the gap, and she drove through. As to what my condition was when I got there, will say, I was nearly dead, I had run so, almost exhausted, I could scarcely breathe, and when he started to the gap he noticed me standing there, and he says, 'Mrs. Allcorn do you want to go through,' and I told him, 'Yes,' and I walked on past the buggy and went on, and they came on, passed me, and went on around by my house, and I was behind them; yes, sir, I went on home then."

Mrs. Blanche Griffin testified to the age of Iva May and said she was fourteen years of age at the time of this alleged occurrence and her daughter reported this matter to her the next day. The physician, who was in attendance at the birth of Iva May also testified that she was fourteen years of age.

Appellant's sister, who went with appellant and the prosecuting witness to the party, testified that Iva May did not try to get her brother to go by her home first, but when they were on their way home, prosecuting witness said she was going to stay all night with her, but changed her mind after they got to Mr. Wilkerson's; that she, witness, got out of the buggy and appellant took prosecuting witness on to her home.

Fred Wilkerson testified he lived only about 400 yards from the gap where this occurrence is alleged to have had its inception; that he was out at his lot seeing about his hogs and he had to go half way to this gap after his hogs about the time appellant was driving off with the prosecuting witness; that he was close enough to have heard it had there been loud talking or crying and he heard none. That he was a brother-in-law of defendant.

Appellant testified that the took the two girls to the party; that he carried his sister home and started to carry the prosecuting witness home, and when he got to the gap, he got out to open it and asked Iva May to kiss him, and as she didn't seem to care, he put his hand on her shoulder and kissed her, when Mrs. Allcorn appearing, the girl remarked, "Oh, Lordy, what will I do." That he did not attempt to rape her and had no such thought, and denied in detail the transaction as testified to by the prosecuting witness.

The jury were the judges of the weight to be given to the testimony, and the first two grounds in the motion present no error.

The next ground complains of the action of the court in overruling the motion for a continuance on account of the absence of Harmon Dearson and Bud Krueger. By Dearson it is stated he expected to prove that he was at the Wilkerson home, and that he heard no loud talking or crying. It appears that this witness had been summoned by the State, and since being summoned had moved to another county; that the State, when the case was called for trial had an attachment issued for the witness; this was not diligence on the part of the State, and as the defendant, prior to this time, had made no application to have this witness subpoenaed in his behalf, this would not be diligence as to him. As to the witness Krueger, it was stated he would testify that since the alleged commission of the offense he had bought eggs from the prosecutrix on different occasions, and on one of these occasions she stated to witness that defendant did nothing to her but kiss her. It has been the unvarying rule in this court that when testimony is desired to impeach or discredit a witness, it presents no ground for a new trial. However, under some circumstances, this testimony might amount to more than merely impeaching testimony. If the application had shown that the prosecuting witness had made this statement to Krueger before the prosecution was begun, or shortly after the transaction, we would be inclined to hold that a new trial should have been granted. But as the record in this case does not show when this witness would testify that the girl made this statement, whether before or subsequent to arrest, we can not hold that it would serve any purpose other than to discredit and impeach the State's witness and under such circumstances it presents no ground for reversal. Tate v. State, 66 Texas Crim. Rep., 198, 146 S. W. Rep., 169, and cases there cited.

Three of the jurors seek to impeach their verdict by testifying when the motion for new trial was heard that some of the jurors had stated it was not necessary for defendant to have the specific intent to rape, but if he placed his hands on the prosecuting witness he would be guilty of assault to rape, and if they had not been so informed they would not have agreed to the verdict. In this case the court instructed the jury:

"1. 'Rape' is the carnal knowledge of a female under the age of fifteen years, other than the wife of the person, with or without her consent, and with or without the use of force, threats or fraud.

"2. If you believe from the evidence, beyond a reasonable doubt, that the defendant, Tom Collins, in the County of Burleson and State of Texas on or about the 19th day of November, A. D. 1910, did make an assault upon the said Iva May Griffin by putting his hands and arms around the person of the said Iva May Griffin and fondling her with the specific intent, on his part, to have carnal knowledge of and sexual intercourse with the said Iva May Griffin; and you further find from the evidence that the said Iva May Griffin, was at the time, under the age of fifteen years, then you will find the defendant guilty, as charged in the second count of the indictment, and assess his punish-

ment at confinement in the penitentiary for any term of years not less than two years.

"If you do not so believe from the evidence, beyond a reasonable doubt, you will acquit the defendant on the charge of assault with intent to rape.

"3. If you believe from the evidence, beyond a reasonable doubt, that the defendant, Tom Collins, in the County of Burleson and State of Texas, on or about the 19th day of November, A. D. 1910, did assault the said Iva May Griffin by putting his hands upon her person, and by fondling her person, against her will, and that such conduct, if any, did cause the said Iva May Griffin a sense of shame and mortification; and you do not find from the evidence, beyond a reasonable doubt, that he did so with the specific intent to carnally know and have sexual intercourse with the said Iva May Griffin, then you will find the defendant guilty of aggravated assault, and assess his punishment at a fine of not less than twenty-five dollars nor more than one thousand dollars, or by confinement in the county jail for a term of not less than one month nor more than two years, or by both such fine and imprisonment.

"If you do not so believe from the evidence, beyond a reasonable doubt, you will acquit the defendant on the charge of aggravated assault.

"4. If you believe from the evidence that the defendant did put his arms around the said Iva May Griffin, and that he did so with her consent; and, you do not believe from the evidence, beyond a reasonable doubt that he did so with the intention of having sexual intercourse with the said Iva May Griffin, then you are instructed to return a verdict of 'not guilty.'

"5. If you find from the evidence that the defendant is guilty of an assault, but you have a reasonable doubt whether such assault is assault with intent to rape or aggravated assault, then you must give the defendant the benefit of the doubt, and in such case, if you find him guilty, it could not be of a higher grade than aggravated assault."

It will be seen that the court in his charge correctly presented the law in this respect, presenting the issue that before they would be authorized to convict of assault to rape, they must find that he had the specific intent to have sexual intercourse with the prosecuting witness; and if they did not so find, beyond a reasonable doubt, he would be guilty of no higher grade of offense than aggravated assault, and if he placed his hands on the girl with her consent with no intention to rape her, he would be guilty of no offense. It has always been held that a juryman will not be permitted to impeach the verdict by testifying that he misunderstood the charge of the court. (Mitchell v. State, 33 S. W. Rep., 367; McCullough v. State, 35 Texas Crim. Rep., 268; Tolston v. State, 42 S. W. Rep., 988; Weatherford v. State, 31 Texas Crim. Rep., 530.)

Bill No. 2, as qualified by the court, presents no error. It was developed by the defendant on cross-examination that the prosecuting witness had talked to Mr. Heslip, of counsel for the State, before testifying, for the purpose of impairing her testimony. Under these circumstances it was not error to permit her to state she had told Mr. Heslip the same statement she had testified to on the trial.

In bill No. 3, it is shown that while appellant was on the stand, he was asked if he had said to Mr. Freda, on the night of the alleged rape, "there is two cocks out there in that buggy, and I am bound to have one of them before morning." It is not shown what the answer was to the question, if any was made, by the bill. If witness stated he did make such statement, it would be very material to the State's case. If he did not, he would have been permitted to so answer, and if the State could not, as appellant states, produce Mr. Freda, his answer would be accepted as true. The bill not showing what was the answer of the witness, or that he answered at all, it is not in such condition that we can review the matter. (Section 1123, White's Ann. Code.) It is also shown by another bill (No. 6) that Mr. Heslip, while making the closing argument, said: "That if the said Freda (who was a witness in this case, and was subpoenaed, but who is now dead) was alive and in the court today that I believe that Freda would swear that the defendant made the statement that there were two cocks out there in that buggy, and I am going to have one of them before morning. This would present error if it was not shown that it was in reply to remarks of defendant's counsel. In approving the bill the court states: "Allowed with the following explanation: Mr. Mathis, one of defendant's attorneys, stated in his argument to the jury that if Freda were alive that he would not swear to any such things as set out above and if he should do so that he ought to be·sunk deep in hell. Mr. Buchanan, attorney for defendant, had also stated in his argument to the jury that Freda was his friend and was satisfied that he would testify to nothing that would injure the defendant. Mr. Heslip, assisting the State, in his argument stated that ordinarily he would not refer to this matter but as defendant's attorneys had made the above statement he would ·reply and was permitted to make the statement set out in this bill."

The appellant requested the court to instruct the jury in regard to amount of force necessary in this character of case, and unless the jury believed the defendant used sufficient force to establish the specific purpose and intent to have carnal intercourse they would acquit. In the case of Moore v. State, 20 Texas Crim. App., 278, this court, speaking through Judge White, said:

"Where the injured female is under the age of ten years it is neither necessary to allege in the indictment nor to prove on trial that the offense was committed 'with or without consent and with or without the use of force, threats or fraud,' because carnal connection with a female of such tender years is per se rape under any and all

circumstances, whether with her consent or not. (Penal Code, article 528.) Allegations, then, of force, threats and fraud should in such cases never be used. Standard procedents and prescribed forms do not contain them. (1 Whart. Prec. of Ind., 189, 190; 1 Bish. Crim. Proc., section 481.")

In the case of Fowler v. State, recently decided, we discussed this question and cited authorities, also in the case of Hightower v. State, 65 Texas Crim. Rep., 323, 143 S. W. Rep., 1168. In this latter case is discussed the case of Cromeans v. State, 59 Texas Crim. Rep., 611 (cited by appellant) and it is shown that that case does not hold that force must be charged and defined in case of assault to commit the offense of rape on a girl under the age of consent. In the Cromeans case the holding was that the facts did not show that the offense had been committed.

In bill No. 5 it is shown that the prosecuting officer in his argument stated: "Gentlemen of the jury, if you don't convict the defendant in this case, there is no use for the grand jury of your county to hereafter indict any man for the detestable crime of assault with intent to rape, committed in your county." The court instructed the jury not to consider these remarks as they were improper. Appellant presented no special charge, and as the court instructed the jury not to consider the remarks, they are not of such character as would present reversible error. (Edwards v. The State, 61 Texas Crim. Rep., 315, and authorities there cited.)

Appellant complains that in paragraph 2 of the charge (hereinbefore copied) the court gave no definition of assault. The court in said charge required the jury to find beyond a reasonable doubt certain facts to be true which in law would amount to an assault in this character of case, before they would be authorized to convict, and under such circumstances it is immaterial whether or not the court defined that word. The charge fully and fairly presents the issues under the evidence, and the motion for new trial points out no error therein.

The judgment is affirmed.

*Affirmed.*

Prendergast, judge, not sitting.
[Rehearing denied June 26, 1912.—Reporter.]