WALTER DUCKETT V. STATE.

No. 1512. Decided November 6, 1912.

Rehearing denied November 27, 1912.

**1.—Assault to Rape—Bills of Exception—Evidence—Res Gestae.**

Upon trial of assault with intent to rape upon a female under age of consent, there was no error in admitting testimony as to the appearance and condition of prosecuting witness when she reached school, and what she said to the teacher during recess, as this was res gestae; besides, the bill of exceptions was defective.

**2.—Same—Evidence—Res Gestae—Bill of Exceptions.**

Upon trial of assault with intent to rape upon a female under age of consent, there was no error in admitting testimony that prosecutrix complained to her parents several hours after the alleged assault, but as soon as she returned home; this was res gestae and the lapse of time intervening between the assault and prosecutrix's statement could only go to the weight of the testimony.

**3.—Same—Evidence—Circumstances.**

Upon trial of assault to rape on a female under age of consent, there was no error in permitting the statements of the father of prosecutrix that she pointed out to him and the sheriff the place where the alleged assault occurred.

### 4.—Same—Evidence—Self-Serving Declarations.

Upon trial of assault to rape, there was no error in excluding the self-serving declarations of defendant when the officer arrested him.

### 5.—Same—Charge of Court—Specific Intent.

Where, upon trial of assault with intent to rape upon a female under the age of consent, the court had fully charged that the evidence must show the specific intent on the part of the defendant to commit rape upon prosecutrix, beyond a reasonable doubt, before they could convict him, there was no error in refusing a requested charge on the same issue.

### 6.—Same—Requested Charge—Abandonment.

Upon trial of assault with intent to rape, there was no error in refusing a requested charge that if defendant voluntarily abandoned the alleged assault, to acquit him. Nor that prosecutrix must be corroborated. Following Stewart v. State, 61 Texas Crim. Rep., 90, and other cases.

### 7.—Same—Charge of Court—Charge as a Whole.

The charge of the court must always be considered as a whole; and where, upon trial of assault with intent to rape upon a female under the age of consent, the court correctly applied the law to the facts, there was no reversible error.

### 8.—Same—Sufficiency of the Evidence—Specific Intent.

Where, upon trial of assault with intent to rape upon a female under the age of consent, the evidence showed that defendant in a secluded place, while prosecutrix was going to school, called her to him, and that he then pulled up her dress, laid his hands on her leg, and asked her "what it was," when prosecutrix began crying, whereupon, defendant turned her loose, and she proceeded in an excited manner to the school and told her teacher what had happened, etc., and the court properly submitted the question of specific intent to commit rape, the verdict was sustained by the evidence. Davidson, Presiding Judge, dissenting.

Appeal from the District Court of Coryell. Tried below before the Hon. J. H. Arnold.

Appeal from a conviction of assault with intent to rape; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*S. P. Saddler,* for appellant. On question of insufficiency of the evidence to show specific intent to rape: Cromeans v. State, 59 Texas Crim. Rep., 611; Dockery v. State, 35 id., 487; Thomas v. State, 16 id., 535; House v. State, 9 id., 567; Carter v. State, 70 S. W. Rep., 971.

*C. E. Lane,* Assistant Attorney-General, for the State. On question of res gestae: Castillo v. State, 31 Texas Crim Rep., 145; Sentell v. State, 30 S. W. Rep., 226.

On question of the court's charge: Alexander v. State, 58 Texas Crim. Rep., 621.

PRENDERGAST, JUDGE.—By proper indictment it was charged that appellant, on April 5, 1911, did unlawfully make an assault upon Lillie May Young, a female under fifteen years of age, she not being his wife, and attempt to ravish and have carnal knowledge of her.

The appellant was convicted and given the lowest punishment—two years in the penitentiary.

In order that the questions raised and decided may be properly understood, we make a statement of the material evidence.

Lillie May Young, the alleged assaulted party, was a little girl just eight and a half years old. Appellant was a large boy in his 19th year, having reached eighteen years of age in December prior to April 5, 1911, the date of the alleged assault. He was nearly six feet tall and weighed about 145 pounds. Of course, the little girl was not his wife. The parties and their families lived in the country. The little girl and some six or seven neighboring children attended a school some mile or two distant from her home. These children usually went to school together, which appellant knew. In order for the little girl to go to school she had to pass along the road near to the residence of two other neighbors,—one about a half mile from the scene of the trouble and the other something over three hundred yards therefrom. Other neighboring residences were also off at different directions from about a half mile to some distance further. A public road also lay some distance from the scene. Much evidence was introduced by both the State and the appellant to show whether or not he and the little girl could have been seen from where the scene occurred to these respective residences and said road. Taking all the evidence together, the jury were authorized to believe therefrom that from the lay of the land and more or less obstructions, and the distances, one or all, the parties could not have been seen if down on the ground, or the appellant kneeling. If so, that from certain positions at and near the nearest house, they could, and from other positions thereabout, they could not have been seen. All of this evidence was introduced for the purpose of enabling the jury to determine the probability or improbability of the claimed assault. In order for said little girl and other school children to reach the schoolhouse, it was necessary, or at least usual, for all of them to pass through a fence from the outside to the inside of the pasture or field and along where the alleged assault occurred. All of said school children, except the little girl, had already passed along the same route to school that morning from an hour to a half hour before the alleged assault and appellant saw and knew this at the time. Just after these children had passed on to school the appellant was sent, by his father, to hoe some potatoes which were growing right near or in the locality where these children had to pass under the fence and on through the pasture to school, and shortly before the alleged assault the appellant and a younger brother, who attended the school, went to this potato patch, the two stopping together only a short time, when the younger brother also went on to school. Just after this, the appellant began hoeing the potatoes, and the evidence clearly justified the jury to find and believe that he remained engaged at this until the little girl appeared upon the scene. She had been

detained at home because of a late breakfast that morning and could not and did not go with said other children to school, but reached this point about 9 o'clock, or a little after, on her way to school. We will give, at this point, the testimony of the little girl as it is copied in this statement of facts:

"I was right down at the fence that went into Mr. Duckett's pasture when I first saw the defendant that morning. When I first saw him he was hoeing. When I got to the gate I went under the fence at the east end of the gate. Walter Duckett was hoeing potatoes. There was a rake near the fence. Walter Duckett was hoeing at the west end of the rake, about forty feet from the west end of the rake. There was a road or trail that we children traveled going along there to school which passed near the east end of the rake. When I got under the fence Walter Duckett was at the west of the rake. As I went on toward the school house by the east end of the rake Walter Duckett was about the west end of the rake. Just about then he said, 'come here, Lillie May, come here.' I turned toward him. He came toward me. He just pulled up my dress, laid his hand on my leg, and asked me what it was. His hand was under my dress. He was on his knees. When he put his hand on my knee I commenced crying. He turned me loose, and I started on to the school house. I went in the road. I traveled slow until I got a good piece, and then I ran the balance of the way. When I got to the school house books had been taken up. He put his hand on my leg under my dress. He turned me loose after I commenced crying. Miss Josie Priddie was hearing the Fourth Grade class when I got to school. It was about half an hour after I got to school before recess. I had a conversation with Miss Josie Priddie at recess. I was out of the school house when I had this conversation. I called her off to one side. When I talked to Miss Priddie I told her what had happened down there. I told Miss Josie Priddie what had happened down at the rake.  *  *  *  It was on Wednesday last spring some time. I stayed at school that day. I came home that evening. I made a statement that evening to my father and mother when I got home about what had happened to me that day. He put his hand right there, just about my knee, and asked me what that was.

### CROSS-EXAMINATION.

"Q. You testified in the examining trial? A. Yes, sir. Q. Didn't you testify before on the cross-examination this, 'When he put his hand on my knee he asked me what is this'? A. He put his hand above my knee. Q. Did you say this, 'When he put his hand on my knee he asked me what is this? I did not answer him and he got up and went on, that is all that occurred. You signed that. Don't you remember that they took down what you said. A. Yes, sir. Q. And you signed your name to it? A. Yes, sir. Q. Did you say, 'When he put his hand on my knee he asked me what is this, and I did not

answer him and he went on?' A. He stayed on his knees. Q. You went on? Did he say anything to you when you began to cry? A. No. sir. Yes, sir. He said, 'Lillie May, what is the matter?' Q. Then you turned and went on. A. Yes, sir. Q. He stayed there? A. Yes, sir. Q. He never tried to follow you? A. No. sir. Q. Never said anything more to you? A. No, sir. Q. Never did anything more to you? A. No, sir. Q. Just put his hand on you and said, 'Lillie May, what is this?' A. Yes. Q. You did not say anything and started to cry, and then he said, 'Lillie May, what is the matter,' then you turned and walked off? A. Yes, sir. Q. And you said that he never tried to follow you? A. No, sir. Q. That is all that happened then? A. Yes, sir. Q. He never tried to follow you? A. No, sir. Q. He never said anything more to you? A. No, sir. Q. That was all that was said and done? A. Yes, sir.''

Miss Josie Priddie testified: ''I was teaching school at the Schley Schoolhouse on the 5th day of last April. I know Lillie May Young. I remember the circumstance at the time she claimed an assault was made on her by Walter Duckett. I do not remember what day of the week it was. On the morning it is claimed that this occurred I took up school about fifteen minutes until nine. It may have been two or three minutes from that time, but it was right about that time. Autrys children, Urseries children, and Johnsons children usually came to school with Lillie May Young. Autrys and Urseries children were there when school was taken up that morning. Johnsons children did not come that day. Lillie May Young was not there when school was taken up, but came about forty-five minutes later. Her appearance attracted my attention when she came in the house. She came in and was somewhat excited, and I did not stop to question her, but I noticed that she was excited. I noticed that the moment she stepped in the school room, and I did not have a chance to question her until recess. There was something in her expression that showed me she was excited, and I noticed it the minute she stepped in the school room. It was about forty-five minutes after she came in until recess. At recess she called me off and had a conversation with me. As soon as I dismissed for recess I walked out several steps and we were going to the tree, and I had not gotten to the tree when she stopped me. She made a statement to me about something that had happened to her that morning as she came to school. She named Walter Duckett as one whom she had seen on the road. When she called me off she was still excited, and as soon as she began talking to me she commenced crying.''

The testimony further shows that as soon as the school dismissed that evening for the day this little girl went home, and as soon as she reached there she complained to her father and mother of what had occurred to her that morning on her way to school, but witness was not permitted to testify anything of what occurred at the time, or who the party was.

Appellant testified denying that he saw or had anything to do with the little girl that morning, claiming that after he began hoeing the potatoes, having a target rifle with him, he left and went to a different locality in the field or pasture after a rabbit, being gone several minutes when he returned and continued hoeing in the same place. The jury evidently did not believe him and the evidence altogether fully justified the jury to believe the little girl and disbelieve him.

It will be unnecessary to take up in detail the several assigned errors, but we have considered them all fully and will pass upon such as is necessary.

Appellant's bills of exception to the admission and exclusion of evidence are very meagre and do not comply with the well established and uniform holding of this court as to their sufficiency. However, no error which would justify a reversal is shown by any or all of them, even if they were full and in compliance with the rules. By these bills appellant complains of the testimony of the little girl to the effect that she complained to the teacher at recess of what had happened to her on her way to school. Also that when she reached home she complained to her parents of what had happened to her that morning. Also of the testimony of Miss Priddie, the teacher, of the child's appearance when she reached school that morning and her appearance at recess. In allowing the bill to the testimony of the child that she complained to the teacher at recess, the court made this explanation:

"The evidence shows prosecutrix was only eight years of age. She arrived at school after books had been taken up and I felt that she was too young in years to deliberately fabricate a story, and that considering her youth and inexperience it would be most natural for her not to speak out in books to her teacher immediately on arriving at the school house at a time when her teacher was hearing her classes, but to her childish mind it would appear more appropriate for her to suppress her feelings and speech until recess gave her an opportunity to tell of the alleged assault. Recess afforded her, therefore, in the view the court took of the case, the first opportunity for the child to talk and the teacher to hear from the facts regarding the assault. It occurred to me that the statement of prosecutrix to her teacher was a spontaneous one made on the first opportunity considering her excited condition, youth and inexperience, and that it was res gestae, and it was on this theory that the evidence was admitted. However, I did not permit the witness to detail the conversation in question, but excluded, on defendant's objection, the contents of the conversation, but permitted only the fact of said statement by prosecutrix to her teacher to go to the jury, though I felt that what was said was all res gestae."

In allowing the bill that she made complaint to her parents when she reached home that evening, the Judge made this explanation:

"Witness was not permitted to detail what she told her father and mother, but only the fact that she made a statement to them about the assault the first time she saw them after the assault, was permitted to go to the jury." And to another one of the bills, as to her complaint to the teacher at recess, the court, in approving the bill, made this explanation:

"Prosecutrix was only eight years old. She arrived at school house excited very much after books had been taken up. I felt that she was too young and inexperienced to fabricate a story and that she neither had the motive nor capacity to do so. Her childish mind would under the circumstances, not permit her to speak to her teacher in the presence of the whole school, considering the delicacy of the subject, and tell of the assault there in a public way, but that her most natural course would be to express (repress) her feelings and speech until recess, when she could tell her teacher alone of the assault, if any, upon her. I felt that recess was the first opportunity she had to tell her teacher of the assault. She told her then. Her excited state of mind continued from the time she reached school until recess, as stated by the teacher. She was still crying and excited when she made the statement to the teacher. I held this to be res gestae, but in the exercise of caution I did not let her detail the conversation in full, but permitted only evidence of the fact of making such statement and that prosecutrix said she had seen defendant that morning to go to the jury."

In our opinion the appearance and condition of the little girl when she reached school and what she said to the teacher at recess was res gestae and clearly admissible under all the authorities. Sentell v. State, 34 Texas Crim. Rep., 260; Castillo v. State, 31 Texas Crim. Rep., 145; Conger v. State, 63 Texas Crim. Rep., 312; 140 S. W. 1112, and authorities cited in said decisions.

While the lapse of time between the alleged assault and when she complained to her parents was several hours, yet, considering her age, under all the circumstances of this case, in our opinion that testimony was also admissible. The lapse of time under the circumstances would go to the weight and not to the admissibility of the testimony.

The court did not err in permitting Gus Young, the father of the little girl, to testify that she pointed out to him and the sheriff the place where she claimed this trouble occurred between her and the appellant, as complained of in one of appellant's bills. Neither did the court err in refusing to permit the sheriff to testify that when he arrested appellant about 11 o'clock at night after the offense was committed at about 9 o'clock that morning, after he read the warrant of arrest to appellant, that appellant then said to him he had not seen Lillie May Young that morning and that he had not assaulted her. This clearly was self-serving and inadmissible.

The court in an apt and correct charge first stated the case and

that appellant plead not guilty. He then correctly defined an assault and an assault and battery in accordance with the statute. He also so defined rape of a child under fifteen years of age. Then he aptly and correctly submitted the case to the jury for a finding by telling them that if they believed from the evidence beyond a reasonable doubt that about the time and place stated in the indictment the appellant did make an assault on said child, a female, and take hold of her with his hand with the specific intent then and there to have carnal knowledge of her and to rape her and she was then under fifteen years of age and not his wife, to find him guilty of an assault with intent to rape, and telling them what the penalty was. Then follows another paragraph wherein he charged them that if they believed from the evidence, beyond a reasonable doubt, that on or about said time appellant made an assault in and upon said child, a female not his wife, and she was then under fifteen years of age, but if they had a reasonable doubt as to whether he did so with specific intent at the time to have carnal knowledge of her, either with or without her consent, and he was at said time under twenty-one years of age, to find him guilty of a simple assault, telling them what the penalty was. Then followed another paragraph telling them that unless they find from the evidence beyond a reasonable doubt that appellant did on or about said date make an assault in and upon said child, to acquit him. In the next paragraph he charged the statutory presumption of innocence and if they had a reasonable doubt as to his guilt to acquit him. And in the last paragraph told them they were the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony.

Appellant requested several special charges. One to the effect that the State must show by the evidence beyond a reasonable doubt that the assault, if any, was committed with the specific intent on the part of appellant then to ravish said prosecuting witness and have carnal intercourse with her and, unless they so find to acquit him of the offense of assault with intent to rape. This charge was substantially and fully covered by the charge of the court. In another, he requested that if the jury found from the evidence that the appellant did assault the prosecuting witness but he voluntarily abandoned such assault, to acquit him. This is not the law and should not have been given. Stewart v. State, 61 Texas Crim. Rep., 90, and Ross v. State, 60 Texas Crim. Rep., 547. Neither is it the law that when a party is assaulted with intent to rape, that she must be corroborated.

There are some criticisms and complaints of some paragraphs of the court's charge. The court's charge must always be considered as a whole. We have above stated the substance in full of the court's charge. It correctly covered every phase of the case substantially in accordance with the law and the evidence on the trial. None of

appellant's criticisms of some paragraphs of the court's charge present any reversible error.

The most serious question in the case and the one most forcibly urged by appellant's able attorney is, his contention that the verdict of the jury is not supported by the testimony and that the court should have given his peremptory charge requesting that the jury be instructed to find the defendant not guilty of an assault with intent to rape. We have again and again gone over and studied this record on all the questions raised, but especially on this, and have reached the conclusion that the evidence was amply sufficient to sustain the verdict of the jury.

Each of the twelve jurors were fair, impartial and disinterested. They were doubtless of different ages, from young to old men, selected from different sections over the whole county. They doubtless had different avocations or businesses in life. It was as much their duty, and doubtless would have been their pleasure, to have acquitted the appellant if not guilty, as much so as it was their duty to have convicted him, if guilty. They heard all the testimony detailed by the various witnesses, observed their manner of testifying and looked them in the face when testifying. They heard all of the argument, both for and against appellant by able and experienced attorneys. Then heard read and took with them in the jury room the written charge of the court. The law has made them,—and not the Judges of this court,—the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. They are much more competent to do so, under the circumstances, than the Judges of this court can be when the Judges here do not see nor hear the witnesses testify, and what is brought to us is a mere statement of this on paper. The testimony as brought to us satisfies and convinces us that the appellant committed an assault and battery upon this child as testified to by her. Then the material question is, what was his intention at the time? A strong circumstance which the jury was authorized to consider, and doubtless did consider, was the fact that he testified that he did not see this child on this occasion and did not even speak to her. He did not vouchsafe to tell the jury what his intention was when he assaulted her. What could he have intended when he called this little child to him, got down on his knees before her, pulled up her dress and placed his hands upon her person under her dress? He did not desist, nor turn her loose until the child began crying. If it was not his intention to have sexual intercourse with this child then what was his intention? Certainly it could not be contended that at the time he committed the assault upon her it was necessary for him to have placed this child on the ground, removed whatever of her clothing that was necessary to prevent access to her person. Then prepare himself to the full extent and place himself in the position to have at once penetrated the child before

the evidence justified the jury to determine that his intention was to have carnal intercourse with her. Then what preparation is necessary in such a case? We answer that only so much, considering the parties and their surroundings, as would convince the jury of such men as sat upon the jury in this case, beyond a reasonable doubt, that his intention was to then have sexual intercourse with the child. In our judgment the verdict of the jury was supported by the evidence and the court should not have charged them to find him not guilty. Besides this, the learned trial judge saw all the parties, heard all the witnesses and out of an experience of many years in the active practice of his profession and service upon the bench as judge, must have been of the opinion that this verdict was amply sustained by the evidence, otherwise he would have granted a new trial.

Where, as in this instance, the question is as to the sufficiency of evidence to sustain a conviction, other cases could hardly be found in point which would be decisive of the question, and each case must rest upon its own facts, but we cite Hightower v. State, 65 Texas Crim. Rep., 323; 143 S. W., 1168; Collins v. State, 66 Texas Crim. Rep., 602; 148 S. W., 1065; Fowler v. State, 66 Texas Crim. Rep., 500; 148 S. W., 576. It is unnecessary to cite others.

The judgment will be affirmed.

*Affirmed.*

HARPER, Judge.—After a careful study of the record I concur in the opinion affirming the case. Both opinions show that an assault was made. I agree that before he could have been convicted of assault to rape, the jury must find that the assault was made with the specific intent to have carnal intercourse with her at the time, but this is an issue of fact to be found by the jury, and when properly submitted and the jury so finds, I do not think we should substitute what our judgment of the facts would be, but if the evidence is such that the jury could legitimately draw that deduction, to not disturb the verdict.

DAVIDSON, Presiding Judge.—[dissenting.]—Appellant was convicted of assault to rape, his punishment being assessed at two years' confinement in the penitentiary.

There are some questions raised by bills of exception and on motion for new trial, which we deem unnecessary to discuss in view of the fact that the case will be reversed for want of sufficient evidence to sustain the conviction. Omitting much of the testimony bearing upon the location of the place where the assault is said to have been committed, and coming down to the immediate facts as detailed by the assaulted girl, the record shows as follows: The little girl alleged to have been assaulted was named Lillie Mae Young. She was attending school in the neighborhood where this matter occurred, and

usually went in company with other children to the school, walking some distance to reach the school house from her home. On the particular morning in question she was late and the other children had passed on to school before she left home. She says en route to the school she passed the defendant who was at work hoeing potatoes just inside of a fence. That defendant was standing near a hay rake at the time he called her and a little distance from the west end of it. He said to her, "Come here, Lillie Mae, come here." "I turned toward him. He came toward me. He just pulled up my dress, laid his hand on my leg, and asked me what it was. His hand was under my dress. He was on his knees. When he put his hand on my knee I commenced crying. He turned me loose, and I started on to the school house. I went in the road. I traveled slow until I got a good piece, and then I ran the balance of the way. When I got to the school house books had been taken up. He put his hand on my leg under my dress. He turned me loose after I commenced crying. Miss Josie Priddie was hearing the Fourth Grade class when I got to school. It was about half an hour after I got to school before recess. I had a conversation with Miss Josie Priddie at recess. I was out of the school house when I had this conversation. I called her off to one side. When I talked to Miss Priddie I told her what had happened down there.   *   *   *   I made a statement that evening to my father and mother when I got home about what had happened to me that day. He put his hand right there, just about my knee, and asked me what that was."

On cross-examination she testified: "Q. You testified in the examining trial? A. Yes, sir. Q. Didn't you testify before on the cross-examination this, 'When he put his hand on my knee he asked me what is this?' A. He put his hand up above my knee. Q. Did you say this, 'When he put his hand on my knee he asked me what is this. I did not answer him, and he got up and went on, that is all that occurred.' You signed that. Don't you remember that they took down what you said? A. Yes, sir. Q. And you signed your name to it? A. Yes, sir. Q. Did you say, 'When he put his hand on my knee he asked me what is this, and I did not answer him and he went on?' A. He stayed on his knees. Q. You went on? Did he say anything to you when you began to cry? A. No, sir. Yes, sir. He said, 'Lillie Mae, what is the matter?' Q. Then you turned and went on? A. Yes, sir. Q. He stayed there? A. Yes, sir. Q. He never tried to follow you? A. No, sir. Q. Never said anything more to you? A. No, sir. Q. Never did anything more to you? A. No, sir. Q. Just put his hand on you and said, 'Lillie Mae, what is this?' A. Yes. Q. You did not say anything and started to cry, and then he said, 'Lillie Mae, what is the matter,' then you turned and walked off. A. Yes, sir. Q. And you said that he never tried to follow you? A. No, sir. Q. That is all that happened then? A. Yes, sir. Q. He never tried to follow you? A. No,

sir. Q. He never said anything more to you? A. No, sir. Q. That was all that was said and done? A. Yes, sir.''

This is the record as shown by the statement of facts in regard to this transaction. The appellant denied the entire occurrence, and said that he was not at the place designated by the girl, and so far as he was concerned the matter did not occur. Take the matter in its strongest light, discarding the testimony of appellant, this evidence does not show an assault upon the girl with intent to ravish or to have carnal intercourse with her. Cromeans v. State, 59 Texas Crim. Rep., 611. Whether the assault upon a woman, which includes a girl, was with the intent to commit rape, depends upon the intent with which the assault was made. Where force is charged, or is a necessary element in the offense of rape or assault to rape, then that assault must be made with the specific intent to have carnal intercourse by force and against and without the consent of the assaulted female. If the girl be under fifteen years of age, unless force is specifically charged in the indictment, it does not enter into the case under the decisions of this court. But whether the assault is made by force or not, in any event that assault must be accompanied by the specific intent to have carnal intercourse with the assaulted female. This is true whether the assault was made under the theory of force, threats or fraud, or on a girl where the consummated offense would be rape with or without consent, and with or without force. There cannot be rape without intercourse, or penetration at least, and there cannot be an assault with intent to commit rape without the specific intent to have carnal intercourse with the assaulted party. It is not every assault upon a girl or woman that constitutes assault with intent to rape or to have intercourse with her. Without the intent to have intercourse the assault would not be of a more serious nature than aggravated assault. To carry it beyond this and constitute it an assault to rape, the specific intent must be combined and be a part of the assault. Whatever else may have been the differences in this court heretofore in regard to these matters, there has not been any question but what the assault must be accompanied by the specific intent to have intercourse. There is nothing in the testimony of this little girl that shows a specific intent to have intercourse with her; on the contrary, her evidence leads to the opposite conclusion. It is unnecessary to review the authorities. The facts do not justify the conviction. Cromeans v. State, 59 Texas Crim. Rep., 611. The little girl was assaulted, under her testimony, and it produced in her mind a sense of humiliation or excitement, but the fact that the assault produced in the mind of the female a degree of shame or humiliation does not supply the intent to have intercourse with her. That sense of humiliation and shame would enter into the charge of assault, but it does not supply or furnish evidence of intent to commit rape. There must be shown beyond a reasonable doubt a specific intent to have intercourse to justify this con-

viction. This conviction, if sustained, obliterates all distinctions between assaults and assaults to commit rape.

This was written as the opinion in the case, but my brethren have thought it correct to affirm the judgment. I sign this as a dissent.

[Rehearing denied November 27, 1912.—Reporter.]